Benjamin M. Lopatin, Esq., State Bar No.: 281730
*lopatin@hwrlawoffice.com*
**THE LAW OFFICES OF**
**HOWARD W. RUBINSTEIN, P.A.**
One Embarcadero Center, Suite 500
San Francisco, CA 94111
(800) 436-6437
(415) 692-6607 (fax)

(Additional Counsel appear on signature page)

Attorneys for Plaintiff Gabriel Rojas
and the Proposed Class

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| **GABRIEL ROJAS,** as an individual, and on behalf of all others similarly situated, | Civil No.: **C 12-5099-SBA** |
| *Plaintiff,* | Judge: The Hon. Saundra Brown Armstrong |
| *vs.* | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| **GENERAL MILLS, INC.,** | Action filed October 1, 2012 |
| *Defendant.* | ***Jury Trial Requested*** |
| | ***California Class Representation*** |

Plaintiff, GABRIEL ROJAS, individually, and on behalf of all others similarly situated, by and through his undersigned counsel, and pursuant to *Federal Rule of Civil Procedure* 15(a), hereby files this First Amended Class Action Complaint, and alleges against Defendant, GENERAL MILLS, INC. (collectively referred to herein as "GENERAL MILLS" or "Defendant"), as follows:

## I. INTRODUCTION

1. Defendant has unlawfully, fraudulently, unfairly, misleadingly, and/or deceptively represented that all of its Nature Valley® granola bars are 100% Natural (the

"Products") when in fact, they are not, because they contain Genetically Modified Organisms ("GMOs"), a fact that Defendant fails to disclose in its advertising for the Products.[1]  Defendant specifically manufactures, markets, advertises, and sells its Nature Valley® Oats and Honey Crunchy Granola Bars and Nature Valley® Dark Chocolate Peanut Butter Crunchy Granola Bars as being 100% Natural, including, but not limited to, on the packaging for the Products.[2]

2.       Nature Valley® Oats and Honey Crunchy Granola Bars and Nature Valley® Dark Chocolate Peanut Butter Crunchy Granola Bars make the same exact 100% Natural representation that the rest of General Mills' Nature Valley® granola bars make, which is on the displayed in its advertising for the Products, including, but not limited to, the Products' packaging.

3.       Contrary to Defendant's representations, however, the Products are not 100% Natural because the Products use ingredients containing GMOs, such as Soy, Yellow Corn Flour, Soy Flour and/or Soy Lecithin.  Corn and soy are known to be derived from GMOs.

4.       The Products containing GMOs are not 100% Natural.

5.       Defendant's advertising is unlawful, fraudulent, unfair, deceptive, and/or likely to mislead the public as a result.

6.       Therefore, Plaintiff brings this class action to secure, among other things, equitable relief, declaratory relief, restitution, and in the alternative damages, for a Class of

_____

1.       Plaintiff's GMO omission claim is explicitly not in relation to the Products' labeling, meaning that it is strictly related to advertising other than the label for the Products.

2.       *See* **Exhibit** **1**, attached hereto and incorporated herein, a true and correct copy of the Nature Valley® Oats and Honey Crunchy Granola Bars packaging; *see also* **Exhibit** **2**, attached hereto and incorporated herein, a true and correct copy of the Nature Valley® Dark Chocolate Peanut Butter Crunchy Granola Bars packaging.

similarly situated California purchasers, against GENERAL MILLS, for unlawful, fraudulent, and unfair business practices, in violation of the unlawful, fraudulent, and unfairness prongs of California's Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200 *et seq.*; California's False Advertising Law ("FAL"), Bus. & Prof. Code §§ 17500 *et seq.*; California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq.*, along with a cause of action for Declaratory Judgment and a cause of action for Money Had and Received.

7.      In addition to damages, or in the alternative where appropriate, Plaintiff and the members of the Class seek an order requiring Defendant to cease using genetically modified organisms in its 100% Natural products, and/or stopping Defendant from representing its products are 100% Natural when they are not, and additionally request an order awarding Plaintiff and the Class restitution of the money wrongfully acquired by Defendant.

8.      Plaintiff expressly does not seek to contest or enforce any state law that has requirements beyond those stated in Federal laws or Regulations.  Plaintiff expressly does not request that Defendant be required to label the Products with a GMO disclosure; rather, Plaintiff requests that Defendant: 1) cease advertising or stating the Products as 100% Natural, including but not limited to on the packaging for the Products; and 2) that it informs consumers that the Products contain GMOs in advertising for the Products (explicitly not related to the labeling for the Products).

9.      All allegations herein are based on information and belief and/or are likely to have evidentiary support after reasonable opportunity for further investigation and discovery.

## II. JURISDICTION AND VENUE

10.      This Court has jurisdiction over the subject matter presented by this First Amended Class Action Complaint because it is a class action arising under the Class Action

Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005), which explicitly provides for the original jurisdiction of the Federal Courts of any class action in which any member of the plaintiff class is a citizen of a state different from any Defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000.00, exclusive of interest and costs.  Pursuant to 28 U.S.C. § 1332(d)(2)(A), Plaintiff alleges that the total claims of the individual members of the Plaintiff Class in this action are in excess of $5,000,000.00, in the aggregate, exclusive of interest and costs, and as set forth below, diversity of citizenship exists under CAFA because Plaintiff is a citizen of California, and GENERAL MILLS can be considered a citizen of Delaware.

11.     Venue in this judicial district is proper pursuant to 28 U.S.C. §1391(a) because, as set forth below, Defendant conducts business in, and may be found in, this district, and Plaintiff purchased the subject Products of this action in this judicial district. The "Declaration of Benjamin M. Lopatin, Esq., Pursuant to Civil Code §1780(c) of the Consumer Legal Remedies Act, Civil Code §§1750 et seq." regarding venue under the California Consumer Legal Remedies Act ("CLRA") was submitted with the original Complaint on October 1, 2012 [DE 2] and is fully incorporated herein by reference.

### III. PARTIES

12.     Plaintiff is an individual more than 18 years old, and is a citizen of California, who resides in the city and County of San Francisco. He respectfully requests a jury trial on damage claims. Plaintiff has purchased the Products during the Class Period as described below.

13.     Defendant General Mills Company ("General Mills") is a Delaware licensed corporation with its principal place of business located in the State of Minnesota at One General Mills Blvd., Minneapolis, Minnesota 55426.  General Mills lists with the Minnesota Secretary

of State a Registered Agent designated as National Registered Agents, Inc., 1209 Orange Street, Wilmington, Delaware 19801.  Therefore, General Mills can be considered a "citizen" of the State of Minnesota.  Defendant General Mills also promoted and marketed the Products at issue in this jurisdiction and in this judicial district.

14.      The advertising for the Products relied upon by Plaintiff was prepared and/or approved by GENERAL MILLS and its agents, and was disseminated by GENERAL MILLS and its agents through advertising containing the misrepresentations alleged herein. The advertising for the Products was designed to encourage consumers to purchase the Products and reasonably misled the reasonable consumer, i.e. Plaintiff and the Class into purchasing the Products.  GENERAL MILLS is the owner, manufacturer and distributor of the Products, and is the company that created and/or authorized the unlawful, fraudulent, unfair, misleading and/or deceptive advertising and statements for the Products.

15.      Plaintiff alleges that, at all times relevant herein, GENERAL MILLS and its subsidiaries, affiliates, and other related entities, as well as their respective employees, were the agents, servants and employees of GENERAL MILLS, and at all times relevant herein, each was acting within the purpose and scope of that agency and employment. Plaintiff further alleges on information and belief that at all times relevant herein, the distributors and retailers who delivered and sold the Products, as well as their respective employees, also were GENERAL MILLS's agents, servants and employees, and at all times herein, each was acting within the purpose and scope of that agency and employment.

16.      In addition, Plaintiff alleges that, in committing the wrongful acts alleged herein, GENERAL MILLS, in concert with its subsidiaries, affiliates, and/or other related entities and their respective employees, planned, participated in and furthered a common scheme to induce

members of the public to purchase the Products by means of untrue, misleading, deceptive, and/or fraudulent representations, and that GENERAL MILLS participated in the making of such representations in that it disseminated those misrepresentations and/or caused them to be disseminated.  Whenever reference in this Complaint is made to any act by GENERAL MILLS or its subsidiaries, affiliates, distributors, retailers and other related entities, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents, and/or representatives of GENERAL MILLS committed, knew of, performed, authorized, ratified and/or directed that act or transaction on behalf of GENERAL MILLS while actively engaged in the scope of their duties.

## IV. FACTUAL ALLEGATIONS

### A.  General Mills' Advertising of the 100% Natural Products

17.     GENERAL MILLS manufactures, distributes, markets, advertises, and sells the Products, in at least thirty (30) different varieties/flavors, which claim to be 100% Natural, when in fact, they are not, because they contain GMOs, in the form of corn or soy ingredients in the Products, such as, Soy, Yellow Corn Flour, Soy Flour, and/or Soy Lecithin.

18.     Defendant's 100% Natural statement prominently displayed on the Products' packaging is untrue, misleading, and likely to deceive reasonable consumers, such as Plaintiff and members of the Class, because the Products are not 100% Natural due to the presence of GMOs in the Products.

19.     Nevertheless, Defendant markets, advertises, sells and distributes these Products to California purchasers in California grocery stores, food chains, mass discounters, mass merchandisers, club stores, convenience stores, drug stores and/or dollar stores, as being 100% Natural.

20.     All of the Products' packaging uniformly and consistently states that the Products are 100% Natural.

21.     All Consumers who purchase the Products are exposed to the same 100% Natural claim.

22.     Unfortunately for consumers, they are charged a premium for these alleged 100% Natural Products.

23.     Defendant's 100% Natural statement is misleading and likely to deceive a reasonable purchaser. Defendant's 100% Natural representations convey a series of express and implied claims which Defendant knows are material to the reasonable consumer, and which Defendant intends for consumers to rely upon when choosing to purchase the Products.

24.     At all relevant times herein, Defendant's 100% Natural claims are also broadcast over the Internet on its website, *www.generalmills.com*, making the statement, 100% Natural.

25.     The advertising and marketing for the Products creates the uniform, untrue net-impression that the Products are comprised of only 100% Natural ingredients.  Defendant then charges a premium for the Products that are claimed to be 100% Natural, but that actually contain the same genetically modified ingredients contained in its other products, and/or generally other products in the marketplace, which are not advertised as being 100% Natural.

26.     Simply put, there is nothing natural about genetically modified ingredients.

27.     Therefore, Defendant should cease advertising the Products as 100% Natural and disclose that the Products contain GMOs in its advertising not related to the labeling.

**B.  Genetically Modified Ingredients Are Not 100% Natural**

28.     GMOs are not natural because they grow from seeds that have been modified in a laboratory.  GMOs are plants that grow from seeds in which DNA splicing has been used to

place genes from another source into a plant.  Contrary to Defendant's express or implied representations, the Products use plants or plant derivatives grown or created from GMOs, and are thus not 100% Natural.

29.     The term GM foods or GMOs (genetically-modified organisms) commonly refers to crop plants created for human or animal consumption using the latest molecular biology techniques. These plants have been modified in the laboratory through a process whereby the genes of one species are inserted into another species.   The purported purpose of genetic engineering plants is to enhance certain traits, such as, for example, increased resistance to herbicides.

30.     Genetic engineering can create plants with exact desired traits, where genes can be transferred from one plant to another, and genes from non-plant organisms can also be transferred into a plant. For example, plant geneticists can isolate a gene responsible for drought tolerance and insert that gene into a different plan. The new GMO plant will also gain that modified trait.

31.     One common example is the use of *Bacillus thuringiensis,* (B.t.) genes into corn. B.t. is a naturally occurring bacterium that produces crystal proteins that are lethal to insect larvae. B.t. crystal proteins are commonly transferred into corn, enabling the corn to produce its own pesticides against insects.

32.     A recently released study was published that noted the harmful effects of consuming GMOs; the scientists who conducted the study concluded that rats fed a diet of

genetically modified organisms got sicker faster than their counterparts eating food without GMOs.[3]

33.     Furthermore, the "FDA has not developed a definition for use of the term natural or its derivatives," but it has loosely defined the term "natural" as a product that "does not contain added color, artificial flavors, or synthetic substances."[4] According to federal regulations, an ingredient is synthetic if it is:

> [a] substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources, except that such term shall not apply to substances created by naturally occurring biological processes.

7 C.F.R. §205.2.

34.     Therefore, the FDA has not occupied the field of Natural or GMO labeling, and in any event, this case is not about labeling, it is about advertising statements that are not related to the labeling of the Products, including, but not limited to, the 100% Natural statement on the packaging for the Products.

35.     Similarly, the USDA's Food Safety and Inspection Service ("FSIS") defines a "natural" product as a product that does not contain any artificial or synthetic ingredient and does not contain any ingredient that is more than "minimally processed," defined as:

> (a) those traditional processes used to make food edible or to preserve it or to make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting, or (b) those

---

3.     *See* **Exhibit** **3**, attached hereto and incorporated herein, *Long Term Toxicity of a Roundup Herbicide and a Roundup-Tolerant Genetically Modified Maize*.

4.     *What is the Meaning of 'Natural' on the Label of Food?*, FDA, Transparency, FDA Basics. available at *http://www.fda.gov/AboutFDA/Transparency/Basics/ucm214868.htm* (last visited Feb. 8, 2013).

physical processes which do not fundamentally alter the raw product and/or which only separate a whole, intact food into component parts, e.g., grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices.

Relatively severe processes, e.g., solvent extraction, acid hydrolysis, and chemical bleaching would clearly be considered more than minimal processing.[5]

36.    The scientific description of how GMOs are produced refutes any attempt to categorize them as 'minimally processed,' "all-natural" or substantially similar to something naturally occurring.  Contemporary research on GMOs has made clear that genetic engineering is completely different from natural breeding and entails different risks because the genetic engineering and associated tissue culture processes are imprecise and highly mutagenic, leading to unpredictable changes in the DNA, proteins, and biochemical composition of the resulting GMO that can lead to unexpected toxic or allergenic effects and nutritional disturbances:

[T]he process of inserting a genetically modified gene into the DNA of a plant cell is crude, uncontrolled, and imprecise, and causes mutations – heritable changes – in the plant's DNA blueprint. These mutations can alter the functioning of the natural genes of the plant in unpredictable and potentially harmful ways.

Because of these diverse interactions, and because even the simplest organism is extremely complex, it is impossible to predict the impacts of even a single GM gene on the organism. It is even more impossible to predict the impact of the GMO on its environment – the complexity of living systems is too great.  In short, unintended, uncontrolled mutations occur during the GM process and complex interactions occur at multiple levels within the organism as a result of the insertion of even a single new gene. For these reasons, a seemingly simple genetic modification can give rise to many unexpected changes in the resulting crop and the

5.    *Food Standards and Labeling Policy Book*, USDA, 2005, available at *http://www.fsis.usda.gov/oppde/larc/policies/labeling_policy_book_082005.pdf* (last visited Feb. 8, 2013).

foods produced from it. The unintended changes could include alterations in the nutritional content of the food, toxic and allergenic effects, poor crop performance, and generation of characteristics that harm the environment.[6]

**C.  Increased Public Concern Over the Dangers Associated With Consuming GMOs**

37.     GMOs have become an ever-increasing public concern.  The presence of GMOs in a product may have an unexpected negative impact on an individual's overall health.

38.     Recently, Americans have also expressed a heightened concern about the safety of GMO products, as evinced by the fact that legislation requiring labeling GMOs have been proposed in more than a dozen states since 2011.[7]  In addition,  polls taken by the Pew Center, Consumers Union, Harris Interactive and ABC over the last decade that have consistently found that the vast majority of Americans would like to see genetically modified foods better regulated and labeled.[8]

39.     GMOs are not expected by reasonable consumers, such as Plaintiff and members of the Class, to be in foods that claim to be 100% Natural.

---

6.     Michael Antoniou, *et al.*, *GMO Myths and Truths: An evidence-based examination of the claims made for the safety and efficacy of genetically modified crops*, Earth Open Source, June 2012, p. 11, available at *http://earthopensource.org/files/pdfs/GMO_Myths_and_Truths/GMO_Myths_and_Truths_1.3.pdf* (last visited Feb. 8, 2013).

7.     *See* Amy Harmon & Andrew Pollack, *Battle Brewing Over Labeling of Genetically Modified Food*, N.Y. Times, Science Section, May 24, 2012, available at *http://www.nytimes.com/2012/05/25/science/dispute-over-labeling-of-genetically-modified-food.html?_r=1&* (last visited Feb. 8, 2013).

8.     Monica Eng, *Debate Rages Over Labeling Biotech Foods; Industry Resists Listing Genetically Modified Ingredients; Consumer Worries Continue*, L.A. Times, Business Section, June 2, 2011, available at, *http://articles.latimes.com/2011/jun/02/business/la-fi-gmo-20110602* (last visited Feb. 8, 2013).

40.     Concerns about GMOs fall into three categories: environmental hazards, human health risks, and economic concerns.  Concerns for human health risks associated with GMOs include the possibility that introducing a new gene into a plant, may create a new allergen, causing an allergic reaction in susceptible individuals.

41.     Other concerns that have been raised by environmental groups include the possibility that GMOs contribute to the spread of antibiotic resistance, and could introduce new allergens into foods.[9]  Concern surrounding the latter topic of allergens relates to two factors; the possibility that genes from known allergens may be inserted into crops not typically associated with allergenicity and the possibility of creating new, unknown allergens by either inserting novel genes into crops or changing the expression of endogenous proteins.[10] A person allergic to Brazil nuts, for example only, would be at risk of suffering an allergic reaction from consuming a product that contained a GMO bioengineered to contain DNA from Brazil nuts. The consumer would be unaware of the potential allergic reaction because the product containing the GMO would in no way warn of or even indicate its genetically modified condition.

42.     While the Food and Drug Administration (FDA) has allowed the sale and planting of genetically modified foods for 15 years,  the FDA wrote in a statement to the

---

9.      A. Bakshi, *Potential Adverse Health Effects of Genetically Modified Crops*, J. Toxicol. Environ. Health B. Crit. Rev., 2003, 6(3):211–25, available at *http://www.ncbi.nlm.nih.gov/pubmed/12746139* (last visited Feb. 8, 2013).

10.     Key S, *et al.*, *Genetically Modified Plants and Human Health*, June 2008, *J. R. Soc. Med.* 101(6):290–8, available at *http://www.ncbi.nlm.nih.gov/pubmed/18515776* (last visited Feb 8, 2013).

Tribune that " [u]ltimately, it is the food producer who is responsible for assuring safety," noting also that manufacturers are encouraged to consult with the agency about their products.[11]

43.    The European Union has recognized the potential dangers inherent in consuming genetically modified organisms and has some of the most stringent GMO regulations in the world.  In the European Union all GMOs are considered "new food" and subject to extensive, case-by-case, science based food evaluation by the European Food Safety Authority (EFSA). The EFSA reports to the European Commission who then draft a proposal which if accepted will be adopted by the EC or passed on to the Council of Agricultural Ministers. [12]

44.    Likewise, Italy and Russia are heavily opposed to the cultivation of GMOs.[13]

45.    Furthermore, independent scientific testing of the effects of GMOs on rats, hamsters, and mice have generated great concern as to the safety of GMOs. The tests have been conducted by: Dr. Irina Ermakova, the Institute of High Neural Activity and Neurophysiology of Russian Academy of Sciences, Moscow; Dr. Alexey Surov and Dr. Alexander Baranov, the Institute of Environmental and Evolution Problems and the Institute of Developmental Biology, Moscow); and Dr. Maria Konovalova, the Saratov Agrarian University. All three of these studies demonstrate significant biological and behavioral changes in the animals when GM soy

---

11.    Monica Eng, *Altered food labeling sought \ Prevalence of Genetically Modified Fare Sparks Protests*, Chicago Tribune, May 25, 2011.

12.    John Davison, *GM plants: Science, Politics and EC Regulations*, Plant Science, 2009, available                                                                                                                      at *http://www.cof.orst.edu/cof/teach/agbio2010/Readings%202010/Nagy%20GMO%20EU%20politics%20Plant%20Sci%202010.pdf* (last visited Feb. 8, 2013).

13.    *The GMO Emperor has No Clothes:  A Global Citizens Report on the State of GMOs— False    Promises,    Failed    Technologies,*    p.    38,    available    at *http://www.navdanya.org/attachments/Latest_Publications5.pdf* (last visited Feb. 8, 2013

or GM corn was put into their feed. Some of the biological effects include increased mortality among newborns in the first generation, reduced quantity of offspring, and spike in sterility among second generation animals. On the behavioral front, animals became more aggressive and lost maternal instincts.[14]

46.     Another study conducted by Dr. Arpad Pusztai the potential health risks that GMOs pose to internal organs.  Dr. Arpad Pusztai's research has shown that rats fed with GE potatoes had enlarged pancreases, their brains had shrunk, and their immunity had been damaged. Dr. Eric Seralini's research demonstrated that organ damage can occur.  In addition, the Committee of Independent Research and Information on Genetic Engineering (CRIIGEN) and universities at Caen and Rouen were able to get raw data of Monsanto's 2002 feeding trials on rats at the European Council order and made it public in 2005. The researchers found that rats fed with three approved corn varieties of GE corn—Mon 863, insecticide products, Mon 810, and Roundup Ready herbicide —suffered organ damage. The data "clearly underlines adverse impacts on kidneys and liver, the dietary, detoxifying organs as well as different levels of damages to the heart, adrenal glands, spleen and hematopoietic systems," according to Dr. Gilles Eric Seralini, a molecular biologist at the University of Caen.[15]

47.     Additionally, evidence of liver and kidney toxicity appeared when rats were fed an approved GE maize variety (Mon 863) (Seralini GE, Cellier D. & Spironx de Vendomois, J,

---

14.     *Genetically Modified Soy Linked to Sterility, Infant Mortality*, Institute for Responsible Technology, available at *http://www.responsibletechnology.org/article-gmo-soy-linked-to-sterility* (last visited Feb. 8, 2013).

15.     *See supra* note 13, at 17 (citing Joel Spiroux de Veu de Mois, *et al.*, *A Comparison of the Effects of Three GM Corn Varieties on Mammalian Health*, International Journal of Biological Sciences, 2009, 5:706-726).

2007, "New analysis of rat feeding study with a GM Maize", Archives of Environmental Contamination and Toxicology, 10,1007, S 00244-006-0149-5). Similar effects were observed when Monsanto fed its GT-73 Roundup Ready canola variety to rats. The rats showed a 12 percent to 16 percent increase in liver weight.[16]

48.     Even the World Health Organization (WHO) cautions that "Different GM organisms include different genes inserted in different ways. This means that individual GM foods and their safety should be assessed on a case-by-case basis and that it is not possible to make general statements on the safety of all GM foods."[17]   More recently, Americans have also expressed a heightened concern about the safety of GMO products, as evinced by the fact that 14 states have currently introduced legislation on GMO labeling. Alaska, with its huge wild salmon industry, has already passed a biotech seafood labeling law.[18]

### D.  Plaintiff's Purchase of the Products

49.     Plaintiff has purchased the Products, including but not limited to its Nature Valley® Oats and Honey Crunchy Granola Bars and Nature Valley® Dark Chocolate Peanut Butter Crunchy Granola Bars, which contain corn and/or soy ingredients, during the Class Period, and specifically during 2012, from Safeway grocery stores, located at 350 Bay Street, San Francisco, California 94133, and 735 7th Avenue, San Francisco, California 94118.

---

16.     *Id.* at 18 (citing *Greenpeace critique of Monsanto's Roundup Ready Oilseed Rape, GT73*, Greenpeace, 2004, available at *http://www.greenpeace.at/uploads/media/GT73_Greenpeace_comments_Oct_2004_01.pdf* (last visited Feb. 8, 2013)).

17.     *Id.* at 19 (citing *20 Questions on Genetically Modified Foods*, World Health Organization, Food Safety, available at *http://www.who.int/foodsafety/publications/biotech/20questions/en/* (last visited Feb. 8, 2013)).

18.     *See supra* note 11.

50.     Defendant manufactures, markets, advertises, distributes and sells the Products claiming to be 100% Natural in retail stores, including Safeway stores, located throughout California, and in this judicial district.

51.     As a result, through a variety of advertising, including but not limited to the packaging of the Products, GENERAL MILLS has made untrue and misleading material statements and representations regarding the Products, which have been relied upon by Plaintiff and members of the Class.

### E.  Plaintiff's Reliance on Defendant's 100% Natural Statement

52.     Defendant's 100% Natural statement is displayed throughout the Products' advertising, including, but not limited to, the Products' packaging.

53.     Prior to his purchase, and in purchasing the Products, Plaintiff saw, read, and relied on the material 100% Natural statement displayed on the packaging for the Products.

54.     Plaintiff believed the representation that the Products were 100% Natural meant that the Products do not contain, nor were they made with, any genetically modified and/or bioengineered ingredients.

55.     Plaintiff and members of the Class would not have purchased the Products had they known that they were not 100% Natural.  Likewise, if Plaintiff and members of the Class had known the Products contained GMOs, they would not have purchased them.

56.     Defendant's 100% Natural statement related to the Products is material to a consumer's purchase decision because reasonable consumers, such as Plaintiff and members of the Class, care whether products contain genetically modified or bioengineered ingredients, and thus attach importance to a 100% Natural claim when making a purchasing decision.

### F.  **Plaintiff Has Suffered Economic Damages**

57.     Plaintiff and members of the Class have been economically damaged by their purchase of the Products because the advertising for the Products was and is untrue and/or misleading under California law; therefore, the Products are worth less than what Plaintiff and members of the Class paid for them and/or Plaintiff and members of the Class did not receive what they reasonably intended to receive.

58.     Moreover, Plaintiff paid a price premium for the 100% Natural Products, over other similar products that do not claim to be 100% Natural.

### G.  **Failure to Disclose that the Products Contain GMOs**

59.     Defendant fails to disclose the fact that the Products contain GMOs in its related advertising for the Products.  *This omission claim is explicitly not in relation to the labeling for the Products.* (Emphasis added).

60.     Plaintiff contends that the Products containing GMOs are not 100% Natural and that Defendant's advertising is deceptive and likely to mislead reasonable consumers, like Plaintiff and the Class, as a result.

61.     Although Defendant markets the Products as 100% Natural, it fails to also disclose material information about the Products; the fact that it contains GMO's (explicitly not in relation to the label for the Products).

### V. **CLASS ACTION ALLEGATIONS**

62.     Plaintiff re-alleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this First Amended Class Action Complaint.

63.     Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this class action and seeks certification of the claims and certain issues in this action on behalf of a Class defined as:

> **all California residents who have purchased General Mills Nature's Valley granola bars containing corn or soy ingredients, for personal use, during the period extending from October 1, 2008, through and to the filing date of this First Amended Class Action Complaint.**

Plaintiff respectfully reserve the right to amend the Class definition if further investigation and discovery indicates that the Class definition should be narrowed, expanded, or otherwise modified.  Excluded from the Class are governmental entities, Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries,  and assigns.  Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

64.     Defendant's practices and omissions were applied uniformly to all members of the Class, including any subclass, so that the questions of law and fact are common to all members of the Class and any subclass.

65.     All members of the Class and any subclass were and are similarly affected by the deceptive advertising for the Products, and the relief sought herein is for the benefit of Plaintiff and members of the Class and any subclass.

66.     Based on the annual sales of the Products and the popularity of the Products, it is readily apparent that the number of consumers in both the Class and any subclass is so large as to make joinder impractical, if not impossible.

67.     Questions of law and fact common to the Plaintiff Class and any subclass exist that predominate over questions affecting only individual members, including, *inter alia*:

a.      Whether Defendant's practices and representations related to the marketing, advertising and sales of the Products in California were unlawful in any respect, thereby violating Cal. Bus. & Prof. Code §§ 17200 *et seq*.;

b.      Whether Defendant's practices and representations related to the marketing, advertising and sales of the Products in California were fraudulent in any respect, thereby violating Cal. Bus. & Prof. Code §§ 17200 *et seq*.;

c.      Whether Defendant's practices and representations related to the marketing, advertising and sales of the Products in California were unfair in any respect, thereby violating Cal. Bus. & Prof. Code §§ 17200 *et seq*.;

d.      Whether Defendant's practices and representations related to the marketing, advertising and sales of the Products in California were untrue and/or misleading in any respect, thereby violating Cal. Bus. & Prof. Code §§ 17500 *et seq*.;

e.      Whether Defendant violated Cal. Civ. Code §§ 1750 *et seq*. with its practices and representations related to the marketing, advertising, and sales of the Products within California;

f.      Whether Plaintiff is entitled to a Declaratory Judgment as a result of Defendant's practices and representations related to the marketing, advertising, and sales of the Products;

g.      Defendant's practices and representations related to the marketing, advertising, and sales of the Products amounts to violation of Money Had and Received;

h.      Whether the Products are 100% Natural;

i.      Whether the ingredients contained in the Products are 100% Natural;

j.      Whether the claim 100% Natural on the Products' packaging and advertising is material to a reasonable consumer;

k.      Whether a reasonable consumer is likely to be deceived by a claim that a product is 100% Natural where the product contains or is made from genetically modified ingredients; and,

l.      Whether Defendant's conduct as set forth above injured consumers and if so, the extent of the injury.

68.     The claims asserted by Plaintiff in this action are typical of the claims of the members of the Plaintiff Class and any subclass, as the claims arise from the same course of conduct by Defendant, and the relief sought within the Class and any subclass is common to the members of each.

69.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Plaintiff Class and any subclass.

70.      Plaintiff has retained counsel competent and experienced in both consumer protection and class action litigation.

71.     Certification of this class action is appropriate under Federal Rule of Civil Procedure 23 because the questions of law or fact common to the respective members of the Class and any subclass predominate over questions of law or fact affecting only individual

members. This predominance makes class litigation superior to any other method available for a fair and efficient decree of the claims.

72.     Absent a class action, it would be highly unlikely that the representative Plaintiff or any other members of the Class or any subclass would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed expected recovery.

73.     Certification also is appropriate because Defendant acted, or refused to act, on grounds generally applicable to both the Class and any subclass, thereby making appropriate the relief sought on behalf of the Class and any subclass as respective wholes. Further, given the large number of consumers of the Products, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications.

74.     A class action is a fair and appropriate method for the adjudication of the controversy, in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that individual actions would engender.

75.     The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of this class action.

### VI. FIRST CAUSE OF ACTION:
### VIOLATIONS OF CAL. BUS & PROF. CODE §§ 17200 *ET SEQ.*
### (Unlawful Business Acts and/or Practices)

76.     Plaintiff re-alleges and incorporates by reference the allegations set forth *supra* in this Complaint.

77.     This cause of action is brought on behalf of Plaintiff and members of the general public pursuant to Cal. Bus. & Prof. Code §§ 17200 *et seq.*, which provides that "unfair competition shall mean and include any unlawful . . . business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter I (commencing with Section 17500) as Part 3 of Division 7 of the Business and Professions Code."

78.     Defendant has violated the unlawful prong of the UCL by engaging in business acts and practices that offend public policies and are immoral, unethical, unscrupulous and substantially injurious to consumers, such as Plaintiff and members of the Class.  Specifically, Defendant has advertised that the Products are 100% Natural even though the Products contain GMOs.  Plaintiff contends that Defendant should cease advertising the Products as 100% Natural, because of the presence of GMOs.  In addition, Plaintiff contends that Defendant should state that its Products contain GMOs in its advertising not related to the labeling for the Products.

79.     Plaintiff alleges that Defendant committed unlawful business acts and/or practices, as set forth in detail above. The utility of Defendant's practices related to the unlawful advertising of the Products is negligible, if any, when weighed against the harm to the general public.

80.     The harmful impact upon members of the general public who purchased and used the Products outweighs any reasons or justifications by Defendant for the unlawful advertising practices employed to sell the Products that misleadingly claims to be 100% Natural.

81.     Defendant had an improper motive (profit before accurate marketing) in its practices related to the unlawful advertising of the Products, as set forth above.

82.     The use of such unlawful business acts and practices was and is under the sole control of Defendant, and was deceptively hidden from members of the general public in Defendant's marketing and advertising of the Products.

83.     These unlawful acts and practices had a capacity, tendency, and/or were likely to deceive or confuse reasonable consumers.

84.     Defendant also committed an unlawful business practice by violating the FAL and CLRA as set forth in detail below. These violations serve as predicate violations of this prong of the UCL.

85.     As a purchaser and consumer of Defendant's Products, and as a member of the general public in California who purchased and used the Products, Plaintiff is entitled to and does bring this class action seeking all available remedies under this prong of the UCL.

86.     Defendant's unlawful advertising practices, as set forth above, were intended to promote the sale of the Products.

87.     Pursuant to California Bus. & Prof. Code § 17203, Plaintiff, on behalf of himself and members of the general public, seeks an order of this Court requiring Defendant to restore to Plaintiff and other California purchasers of the Products all monies that may have been acquired by Defendant as a result of such unlawful business acts or practices.  Plaintiff and California purchasers of the Products will be denied an effective and complete remedy in the absence of such an order.

88.     As a result of Defendant's violations of the unlawful prong of the UCL, Plaintiff and California purchasers of the Products are entitled to restitution for out-of-pocket expenses and economic harm.

89.     Pursuant to Civil Code § 3287(a), Plaintiff and California purchasers of the Products are further entitled to pre-judgment interest as a direct and proximate result of Defendant's wrongful conduct. The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and California purchasers of the Products are entitled to interest in an amount according to proof.

**VII. SECOND CAUSE OF ACTION:**
**VIOLATIONS OF CAL. BUS & PROF. CODE §§ 17200 *ET SEQ.***
**(Fraudulent Business Acts and/or Practices)**

90.     Plaintiff re-alleges and incorporates by reference the allegations set forth *supra* in this Complaint.

91.     This cause of action is brought on behalf of Plaintiff and members of the general public pursuant to Cal. Bus. & Prof. Code §§ 17200 *et seq*., which provides that "unfair competition shall mean and include any … fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter I (commencing with Section 17500) as Part 3 of Division 7 of the Business and Professions Code."

92.     Defendant has violated the fraudulent prong of the UCL by engaging in business acts and practices that offend public policies and are immoral, unethical, unscrupulous and substantially injurious to consumers, such as Plaintiff and members of the Class.  Specifically, Defendant has advertised that the Products are 100% Natural even though the Products contain GMOs.  Plaintiff contends that Defendant should cease advertising the Products as 100% Natural, because of the presence of GMOs.  In addition, Plaintiff contends that Defendant should state that its Products contain GMOs in its advertising not related to the labeling for the Products.

93.     Plaintiff alleges that Defendant committed fraudulent business acts and/or practices, as set forth in detail above. The utility of Defendant's practices related to the fraudulent advertising of the Products is negligible, if any, when weighed against the harm to the general public.

94.     The harmful impact upon members of the general public who purchased and used the Products outweighs any reasons or justifications by Defendant for the fraudulent advertising practices employed to sell the Products that misleadingly claims to be 100% Natural.

95.     Defendant had an improper motive (profit before accurate marketing) in its practices related to the fraudulent advertising of the Products, as set forth above.

96.     The use of such fraudulent business acts and practices was and is under the sole control of Defendant, and was deceptively hidden from members of the general public in Defendant's marketing and advertising of the Products.

97.     These fraudulent acts and practices had a capacity, tendency, and/or were likely to deceive or confuse reasonable consumers.

98.     Defendant also committed a fraudulent business practice by violating the FAL and CLRA as set forth in detail below. These violations serve as predicate violations of this prong of the UCL.

99.     As a purchaser and consumer of Defendant's Products, and as a member of the general public in California who purchased and used the Products, Plaintiff is entitled to and does bring this class action seeking all available remedies under this prong of the UCL.

100.    Defendant's fraudulent advertising practices, as set forth above, were intended to promote the sale of the Products.

101.    Pursuant to California Bus. & Prof. Code § 17203, Plaintiff, on behalf of himself and members of the general public, seeks an order of this Court requiring Defendant to restore to Plaintiff and other California purchasers of the Products all monies that may have been acquired by Defendant as a result of such fraudulent business acts or practices.  Plaintiff and California purchasers of the Products will be denied an effective and complete remedy in the absence of such an order.

102.    As a result of Defendant's violations of the fraudulent prong of the UCL, Plaintiff and California purchasers of the Products are entitled to restitution for out-of-pocket expenses and economic harm.

103.    Pursuant to Civil Code § 3287(a), Plaintiff and California purchasers of the Products are further entitled to pre-judgment interest as a direct and proximate result of Defendant's wrongful conduct. The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and California purchasers of the Products are entitled to interest in an amount according to proof.

**VIII. THIRD CAUSE OF ACTION:**
**VIOLATIONS OF CAL. BUS & PROF. CODE §§ 17200 *ET SEQ.***
**(Unfair Business Acts and/or Practices)**

104.    Plaintiff re-alleges and incorporates by reference the allegations set forth *supra* in this Complaint.

105.    This cause of action is brought on behalf of Plaintiff and members of the general public pursuant to Cal. Bus. & Prof. Code §§ 17200 *et seq.*, which provides that "unfair competition shall mean and include any … unfair … business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter I (commencing with Section 17500) as Part 3 of Division 7 of the Business and Professions Code."

106.     Defendant has violated the unfairness prong of the UCL by engaging in business acts and practices that offend public policies and are immoral, unethical, unscrupulous and substantially injurious to consumers, such as Plaintiff and members of the Class.  Specifically, Defendant has advertised that the Products are 100% Natural even though the Products contain GMOs.  Plaintiff contends that Defendant should cease advertising the Products as 100% Natural, because of the presence of GMOs.   In addition, Plaintiff contends that Defendant should state that its Products contain GMOs in its advertising not related to the labeling for the Products.

107.     Plaintiff alleges that Defendant committed unfair business acts and/or practices, as set forth in detail above. The utility of Defendant's practices related to the unfair advertising of the Products is negligible, if any, when weighed against the harm to the general public.

108.     The harmful impact upon members of the general public who purchased and used the Products outweighs any reasons or justifications by Defendant for the unfair advertising practices employed to sell the Products that misleadingly claims to be 100% Natural.

109.     Defendant had an improper motive (profit before accurate marketing) in its practices related to the unfair advertising of the Products, as set forth above.

110.     The use of such unfair business acts and practices was and is under the sole control of Defendant, and was deceptively hidden from members of the general public in Defendant's marketing and advertising of the Products.

111.     These unfair acts and practices had a capacity, tendency, and/or were likely to deceive or confuse reasonable consumers.

112.   Defendant also committed an unfair business practice by violating the FAL and CLRA as set forth in detail below. These violations serve as predicate violations of this prong of the UCL.

113.   As a purchaser and consumer of Defendant's Products, and as a member of the general public in California who purchased and used the Products, Plaintiff is entitled to and does bring this class action seeking all available remedies under this prong of the UCL.

114.   Defendant's unfair advertising practices, as set forth above, were intended to promote the sale of the Products.

115.   Pursuant to California Bus. & Prof. Code § 17203, Plaintiff, on behalf of himself and members of the general public, seeks an order of this Court requiring Defendant to restore to Plaintiff and other California purchasers of the Products all monies that may have been acquired by Defendant as a result of such unfair business acts or practices.  Plaintiff and California purchasers of the Products will be denied an effective and complete remedy in the absence of such an order.

116.   As a result of Defendant's violations of the unfairness prong of the UCL, Plaintiff and California purchasers of the Products are entitled to restitution for out-of-pocket expenses and economic harm.

117.   Pursuant to Civil Code § 3287(a), Plaintiff and California purchasers of the Products are further entitled to pre-judgment interest as a direct and proximate result of Defendant's wrongful conduct. The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and California purchasers of the Products are entitled to interest in an amount according to proof.

### IX. FOURTH CAUSE OF ACTION:
### VIOLATIONS OF CAL. BUS. & PROF. CODE §§ 17500 *ET SEQ.*

118.     Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

119.     In violation of California Bus. & Prof. Code §§ 17500, *et seq.* Defendant disseminated, or caused to be disseminated, the untrue and/or misleading advertising representations that claim that the Products are 100% Natural.   Defendant's advertising representations are untrue or misleading because the presence of GMOs in the Products renders them to not be 100% Natural.   Plaintiff contends that Defendant should cease advertising the Products as 100% Natural, because of the presence of GMOs.   In addition, Plaintiff contends that Defendant should state that its Products contain GMOs in its advertising not related to the labeling for the Products.

120.     Defendant's advertising representations for the Products are by their very nature untrue and/or misleading within the meaning of California Bus. & Prof. Code §§ 17500 *et seq.* The representations were likely to deceive reasonable consumers.

121.     In making and disseminating the deceptive representations alleged herein, Defendant knew or should have known that the representations were misleading, and acted in violation of California's Bus. & Prof. Code §§ 17500 *et seq.*

122.     As a direct and proximate result of Defendant's wrongful conduct, Plaintiff and California purchasers of the Products have suffered substantial monetary and non-monetary damage.

123.     Pursuant to Bus. & Prof. Code § 17535, Plaintiff, on behalf of himself and other California purchasers of the Products, seeks an order of this Court requiring Defendant to

restore to California purchasers of the Products all monies that may have been acquired by Defendant as a result of such unlawful, fraudulent, unfair, misleading, and/or deceptive acts or practices.

124.    As a result of Defendant's violations of the FAL, Plaintiff and California purchasers of the Products are entitled to restitution for out-of-pocket expenses and economic harm.

125.    Pursuant to Civil Code § 3287(a), Plaintiff and California purchasers of the Products are further entitled to pre-judgment interest as a direct and proximate result of Defendant's wrongful conduct.

126.    The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and California purchasers of the Products are entitled to interest in an amount according to proof.

**X. FIFTH CAUSE OF ACTION:**
**FOR VIOLATIONS OF CAL. CIV. CODE §§ 1750 *ET SEQ.***

127.    Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

128.    This cause of action is brought pursuant to Cal. Civ. Code §§ 1750 *et seq.*

129.    Plaintiff and each California purchaser of the Products are "consumers" within the meaning of Civil Code §1761(d).

130.    The purchases of the Products by Plaintiff and California purchasers of the Products were and are "transactions" within the meaning of Civil Code §1761(e).

131.    Defendant has represented that the Products are 100% Natural.   Plaintiff contends that Defendant advertised the Products as 100% Natural, when they are not, because of

the presence of GMOs in the Products' ingredients, which renders the Products not 100% Natural, and which violated the CLRA in at least the following respects:

    a.    In violation of Civil Code §1770(a)(5), GENERAL MILLS represented that the Products have characteristics, ingredients, uses, and benefits which they do not have;

    b.    In violation of Civil Code §1770(a)(7), GENERAL MILLS represented that the Products are of a particular standard, quality, or grade, which they are not;

    c.    In violation of Civil Code §1770(a)(9), GENERAL MILLS advertised the Products with an intent not to sell the Products as advertised;

    d.    In violation of Civil Code §1770(a)(14), GENERAL MILLS represented that the purchase of the Products confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; and

    e.    In violation of Civil Code §1770(a)(16), GENERAL MILLS represented that the subject of the sale of the Products has been supplied in accordance with a previous representation when it has not.

132.    Plaintiff seeks and is entitled to injunctive, equitable relief in the form of an order requiring Defendant to make full restitution to California purchasers of the Products of all monies wrongfully obtained as a result of the conduct described above.

133.    Plaintiff, by and through counsel, has notified Defendant in writing of the particular violations of § 1770 of the CLRA, and demanded that it take certain corrective actions within the period prescribed by the CLRA for such demands.

134.    Defendant has failed to adequately respond to the demands for corrective action within the time prescribed by the CLRA.

135.    Therefore, Plaintiff requests statutory and actual damages, as well as punitive damages, interest and attorneys' fees as authorized by § 1780(a) of the CLRA, along with this claim for injunctive relief.

136.    In addition to an award of damages, Plaintiff seeks and is entitled to, pursuant to § 1780(a)(2) of the CLRA, an order for the equitable relief described above, as well as costs, attorney's fees and any other relief which the Court deems proper.

## XI.  SIXTH CAUSE OF ACTION
### DECLARATORY JUDGMENT

137.    Plaintiff re-alleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this First Amended Class Action Complaint.

138.    This cause of action is explicitly being pled in the alternative to Plaintiff's causes of action at law for damages.

139.    Defendant has represented that its Nature Valley® granola bars are 100% Natural, when in fact, they are not, because they contain GMOs, a fact that Defendant fails to disclose in its advertising for the Products that is not related to the labeling for the Products.

140.    Plaintiff and the members of the Class seek a declaratory judgment, pursuant to the Federal Declaratory Judgments Law, 28 U.S.C. §§ 2201 *et seq.* and *Federal Rule of Civil Procedure* 57, requiring Defendant to cease using genetically modified organisms in its 100% Natural products, and/or requiring Defendant to cease from representing its products are 100% Natural, when they are not, because they contain GMOs.

141.    In requesting this declaratory relief, Plaintiff is requesting an interpretation of the rights, legal status and relationships of the parties under the above law and facts.

142.    Such interpretation is appropriate under the provisions of the Federal Declaratory Judgments Law, 28 U.S.C. §§ 2201 *et seq.* and *Federal Rule of Civil Procedure* 57.

143.    Plaintiff seeks all available remedies pursuant to this cause of action.

### XII. SEVENTH CAUSE OF ACTION: MONEY HAD AND RECEIVED

144.    Plaintiff re-alleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this First Amended Class Action Complaint.

145.    This cause of action is explicitly being pled in the alternative to Plaintiff's causes of action at law for damages.

146.    Defendant received money from the Plaintiff and members of the Class that was intended to be used for the benefit of Plaintiff and Members of the Class.

147.    However, the money was not used for the benefit of Plaintiff or Members of the Class because the Plaintiff and Members of the Class did not receive what they paid for, which was a 100% Natural product.  The Products purchased by Plaintiff and Members of the Class are not 100% Natural because, as stated herein, they contain GMOs.

148.    Defendant accepted and retained the purchase price it earned from sales of the Products to Plaintiff and Members of the Class, and Defendant has since refused to return the money expended by Plaintiff and Members of the Class for their purchase of the Products.

149.    Plaintiff seeks all available remedies pursuant to this cause of action.

### XIII. <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff, GABRIEL ROJAS, individually, and on behalf of all others similarly situated, prays for relief pursuant to each cause of action set forth in this Complaint as follows:

1.      For an order certifying that the action may be maintained as a class action, certifying Plaintiff as representative of the Class, and designating his attorneys Class counsel;

2.      For an award of equitable relief as follows:

(a)     Enjoining Defendant from making any claims for the Products found to violate the UCL, FAL, or CLRA as set forth above; and

(b)     Requiring Defendant to make full restitution of all monies wrongfully obtained as a result of the conduct described in this Complaint.

3.      For an award of attorney's fees pursuant to, *inter alia*, § 1780(d) of the CLRA and Code of Civil Procedure § 1021.5.

4.      For actual damages in an amount to be determined at trial;

5.      For actual, statutory, and punitive damages in an amount to be determined at trial for the Fifth Cause of Action violations of the CLRA.

6.      For a Declaratory Judgment requiring Defendant to cease using genetically modified organisms in its 100% Natural Products, and/or requiring Defendant to cease representing its Products are 100% Natural, when they are not, because they contain GMOs.

7.      For all available relief under Plaintiff's cause of action for Money Had and Received;

8.      For an award of costs and any other award the Court might deem just, appropriate, or proper; and

9.      For pre- and post-judgment interest on any amounts awarded**.**

## XIV. DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Respectfully Submitted,**

**Dated: <u>February 8, 2013</u>**

By: <u>/s/   Benjamin M. Lopatin</u>
Benjamin M. Lopatin, Esq.
Cal. Bar No.: 281730
*lopatin@hwrlawoffice.com*
**THE LAW OFFICES OF**
**HOWARD W. RUBINSTEIN, P.A.**
One Embarcadero Center
Suite 500
San Francisco, CA 94111
(800) 436-6437
(415) 692-6607 (fax)

L. De-Wayne Layfield, Esq.
Texas Bar No.:  12065710
*dewayne@layfieldlaw.com*
**LAW OFFICE OF**
**L. DEWAYNE LAYFIELD**
PO Box 3829
Beaumont, TX 77704-3829
(409) 832-1891
(866) 280-3004 (fax)
(To apply as counsel *Pro Hac Vice*)

**Angela Arango-Chaffin, Esq.**
Fla. Bar No: 87919
*angela@chaffinlawfirm.com*
1455 Ocean Drive
Suite 811
Miami Beach, FL 33139
(713) 818-2515 (o);
(713) 952-5972 (f)
(To apply as counsel *Pro Hac Vice*)

Attorneys for Plaintiff
Gabriel Rojas and the Proposed Class

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this <u>8th day of February, 2013</u>, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record by transmission of Notices of Electronic Filing generated by CM/ECF.


<u>/s/  Benjamin M. Lopatin</u>
Benjamin M. Lopatin, Esq.

# EXHIBIT

# 1



NATURE VALLEY
100% NATURAL

CRUNCHY
granola bars

Oats 'n Honey
16g of whole grain*

NET WT 1.5 OZ (42g)

Ingredients: Whole Grain Oats, Sugar, Canola Oil, Yellow Corn Flour, Honey,
Soy Flour, Brown Sugar Syrup, Salt, Soy Lecithin, Baking Soda, Natural Flavor.
CONTAINS SOY; MAY CONTAIN PEANUT, ALMOND AND PECAN INGREDIENTS
DISTRIBUTED BY GENERAL MILLS SALES, INC., MINNEAPOLIS, MN 55440 USA    © 2011 General Mills    3970669





**NATURE VALLEY**
100% NATURAL

**Where do you take your bar?**

Maybe it's when you're out walking a local trail with a friend, or on last summer's great rafting trip with family.

Visit us on facebook or twitter to share your stories, and while you're at it keep sharing those bars.

We'll bake more ☺

Share your story on our Facebook page or tweet us!

on our favorite rafting trip
Mike — NY

a perfect snack out on the hiking trail
Sara — ID

Love to take them on camping trips with my friends
Carl — OK

TO CLOSE INSERT TAB HERE

100% Recycled Paperboard™

# EXHIBIT

# 2



**Nutrition Facts** Serving Size: 2 bars (42g), Amount Per Serving: **Calories** 190, Calories from Fat 70, **Total Fat** 8g (12% DV), Saturated Fat 1.5g (7% DV), Trans Fat 0g, **Cholesterol** 0mg (0% DV), **Sodium** 170mg (7% DV), **Total Carbohydrate** 27g (9% DV), Dietary Fiber 3g (10% DV), Sugars 12g, **Protein** 4g, Iron (4% DV). Not a significant source of vitamin A, vitamin C and calcium. Percent Daily Values (DV) are based on a 2,000 calorie diet.

Carbohydrate Choices: 2

0  16000 50706  7

**NATURE VALLEY**
100% NATURAL

CRUNCHY
granola bars

Dark Chocolate Peanut Butter

NET WT 1.49 OZ (42g)

190 CALORIES PER 2 BARS

**Ingredients:** Whole Grain Oats, Sugar, Canola Oil, Dark Chocolate Chips (sugar, chocolate liquor, cocoa butter, soy lecithin, natural flavor, salt), Roasted Peanuts, Yellow Corn Flour, Soy Flour, Peanut Butter (peanuts, salt), Brown Sugar Syrup, Honey, Salt, Natural Flavor, Soy Lecithin, Baking Soda. CONTAINS PEANUT, SOY; MAY CONTAIN ALMOND AND PECAN INGREDIENTS. DISTRIBUTED BY GENERAL MILLS SALES, INC., MINNEAPOLIS, MN 55440 USA    © 2012 General Mills    3596378101



## Nutrition Facts

Serving Size 2 bars (42g)
Servings Per Container 6

| Amount Per Serving | 2 bars | 1 bar |
| --- | --- | --- |
| Calories | 190 | 100 |
| Calories from Fat | 70 | 35 |

| | **% DV*** | **% DV*** |
| --- | --- | --- |
| **Total Fat** 8g | 12% | 4g 6% |
| Saturated Fat 1.5g | 7% | 0.5g 4% |
| Trans Fat 0g | | 0g |
| Cholesterol 0mg | 0% | 0mg 0% |
| Sodium 170mg | 7% | 85mg 4% |
| **Total Carbohydrate** 27g | 9% | 14g 5% |
| Dietary Fiber 3g | 10% | 1g 5% |
| Sugars 12g | | 6g |
| **Protein** 4g | | 2g |
| Iron | 4% | 2% |

*16g of whole grain per serving.
At least 48g recommended daily.

Not a significant source of vitamin A, vitamin C and calcium.

**Percent Daily Values (% DV) are based on a 2,000 calorie diet. Your daily values may be higher or lower depending on your calorie needs.

| | Calories: | 2,000 | 2,500 |
| --- | --- | --- | --- |
| Total Fat | Less Than | 65g | 80g |
| Sat Fat | Less Than | 20g | 25g |
| Cholesterol | Less Than | 300mg | 300mg |
| Sodium | Less Than | 2,400mg | 2,400mg |
| Total Carbohydrate | | 300g | 375g |
| Dietary Fiber | | 25g | 30g |

**Ingredients:** Whole Grain Oats, Sugar, Canola Oil, Dark Chocolate Chips (sugar, chocolate liquor, cocoa butter, soy lecithin, natural flavor, salt), Roasted Peanuts, Yellow Corn Flour, Soy Flour, Peanut Butter (peanuts, salt), Brown Sugar Syrup, Honey, Salt, Natural Flavor, Soy Lecithin, Baking Soda. CONTAINS PEANUT, SOY. MAY CONTAIN ALMOND AND PECAN INGREDIENTS.

DIST. BY GENERAL MILLS SALES, INC.
MINNEAPOLIS, MN 55440 USA

UPC 42591

# NATURE VALLEY®
100% NATURAL
granola bars

Dark Chocolate
Peanut Butter

## CRUNCHY
granola bars

### Dark Chocolate Peanut Butter
16g of whole grain*

6 · 1.49 OZ (42g) 2-BAR POUCHES   NET WT 8.94 OZ (253g)

ENLARGED TO SHOW DETAIL

Take a bar with you wherever you go!

BETTER IF USED BY

**12 BARS**

0  16000 42591  0

© 2012 General Mills
Carbohydrate Choices: 2

37371140103

NATURE VALLEY®
100% NATURAL
granola bars

Dark Chocolate
Peanut Butter

**12 BARS**

Quality Guarantee
We're committed to quality. In fact, we unconditionally guarantee it. If you are not satisfied with the quality of this product, a prompt refund or replacement of equal value will be made. Your comments and questions are welcome. Save the UPC and date information and contact us.
CALL: 1-800-231-0308 7:30 a.m. – 5:30 p.m. CT weekday)
WRITE: General Mills, Box 200, Mpls, MN 55440
www.GeneralMills.com

No matter where **the path** takes you...

official natural granola bar of...

NATURE VALLEY®
100% NATURAL
is there.



# EXHIBIT

# 3

Food and Chemical Toxicology xxx (2012) xxx–xxx

Contents lists available at SciVerse ScienceDirect

# Food and Chemical Toxicology

journal homepage: www.elsevier.com/locate/foodchemtox





# Long term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize

Gilles-Eric Séralini [a,*], Emilie Clair [a], Robin Mesnage [a], Steeve Gress [a], Nicolas Defarge [a], Manuela Malatesta [b], Didier Hennequin [c], Joël Spiroux de Vendômois [a]

[a] University of Caen, Institute of Biology, CRIIGEN and Risk Pole, MRSH-CNRS, EA 2608, Esplanade de la Paix, Caen Cedex 14032, France
[b] University of Verona, Department of Neurological, Neuropsychological, Morphological and Motor Sciences, Verona 37134, Italy
[c] University of Caen, UR ABTE, EA 4651, Bd Maréchal Juin, Caen Cedex 14032, France

## ARTICLE INFO

Article history:
Received 11 April 2012
Accepted 2 August 2012
Available online xxxx

Keywords:
GMO
Roundup
NK603
Rat
Glyphosate-based herbicides
Endocrine disrupting effects

## ABSTRACT

The health effects of a Roundup-tolerant genetically modified maize (from 11% in the diet), cultivated with or without Roundup, and Roundup alone (from 0.1 ppb in water), were studied 2 years in rats. In females, all treated groups died 2–3 times more than controls, and more rapidly. This difference was visible in 3 male groups fed GMOs. All results were hormone and sex dependent, and the pathological profiles were comparable. Females developed large mammary tumors almost always more often than and before controls, the pituitary was the second most disabled organ; the sex hormonal balance was modified by GMO and Roundup treatments. In treated males, liver congestions and necrosis were 2.5–5.5 times higher. This pathology was confirmed by optic and transmission electron microscopy. Marked and severe kidney nephropathies were also generally 1.3–2.3 greater. Males presented 4 times more large palpable tumors than controls which occurred up to 600 days earlier. Biochemistry data confirmed very significant kidney chronic deficiencies; for all treatments and both sexes, 76% of the altered parameters were kidney related. These results can be explained by the non linear endocrine-disrupting effects of Roundup, but also by the overexpression of the transgene in the GMO and its metabolic consequences.

© 2012 Elsevier Ltd. All rights reserved.

## 1. Introduction

There is an ongoing international debate as to the necessary length of mammalian toxicity studies in relation to the consumption of genetically modified (GM) plants including regular metabolic analyses (Séralini et al., 2011). Currently, no regulatory authority requests mandatory chronic animal feeding studies to be performed for edible GMOs and formulated pesticides. However, several studies consisting of 90 day rat feeding trials have been conducted by the biotech industry. These investigations mostly concern GM soy and maize that are rendered either herbicide tolerant (to Roundup (R) in 80% of cases), or engineered to produce a modified Bt toxin insecticide, or both. As a result these GM crops contain new pesticide residues for which new maximal residual levels (MRL) have been established in some countries.

If the petitioners conclude in general that there is no major change in genetically modified organism (GMO) subchronic toxicity studies (Domingo and Giné Bordonaba, 2011; Hammond et al., 2004, 2006a,b), significant disturbances have been found and may be interpreted differently (Séralini et al., 2009; Spiroux de Vendômois et al., 2010). Detailed analyses have revealed alterations in kidney and liver functions that may be the signs of early chronic diet intoxication, possibly explained at least in part by pesticide residues in the GM feed (Séralini et al., 2007; Spiroux de Vendômois et al., 2009). Indeed, it has been demonstrated that R concentrations in the range of $10^3$ times below the MRL induced endocrine disturbances in human cells (Gasnier et al., 2009) and toxic effects thereafter (Benachour and Seralini, 2009), including in vivo (Romano et al., 2012). After several months of consumption of an R-tolerant soy, the liver and pancreas of mice were affected, as highlighted by disturbances in sub-nuclear structure (Malatesta et al., 2008a, 2002a,b). Furthermore, this toxic effect was reproduced by the application of R herbicide directly to hepatocytes in culture (Malatesta et al., 2008b).

Abbreviations: GM, genetically modified; R, Roundup; MRL, maximal residual levels; GMO, genetically modified organism; OECD, Organization for Economic Cooperation and Development; GT, glutamyl-transferase; PCA, principal component analysis; PLS, partial least-squares; OPLS, orthogonal partial least-squares; NIPALS, Nonlinear Iterative Partial Least Squares; OPLS-DA, Orthogonal Partial Least Squares Discriminant Analysis; G, glycogen; L, lipid droplet; N, nucleus; R, rough endoplasmic reticulum (on microscopy pictures only); U, urinary; UEx, excreted in urine during 24 h; APPT, Activated Partial Thromboplastin Time; MCV, Mean Corpuscular Volume; PT, Prothrombine Time; RBC, Red Blood Cells; ALT, alanine aminotransferase; MCHC, Mean Corpuscular Hemoglobin Concentration; A/G, Albumin/Globulin ratio; WBC, White Blood Cells; AST, aspartate aminotransferase.
* Corresponding author. Tel.: +33 (0)231565684; fax: +33 (0)231565320.
E-mail address: criigen@unicaen.fr (G.-E. Séralini).

0278-6915/$ - see front matter © 2012 Elsevier Ltd. All rights reserved.
http://dx.doi.org/10.1016/j.fct.2012.08.005

2 G.-E. Séralini et al./Food and Chemical Toxicology xxx (2012) xxx–xxx

Since then, long-term and multi-generational animal feeding trials have been performed with some possibly providing evidence of safety, while others conclude on the necessity of further investigations because of metabolic modifications (Snell et al., 2011). However, none of these studies have included a detailed follow-up of the animals with up to 11 blood and urine samples over 2 years, and none has investigated the NK603 R-tolerant maize.

Furthermore, toxicity evaluation of herbicides is generally performed on mammalian physiology through the long-term study of only their active principle, rather than the formulation used in agriculture, as was the case for glyphosate (Williams et al., 2000), the active herbicide constituent of R. It is important to note that glyphosate is only able to efficiently penetrate target plant organisms with the help of adjuvants present in the various commercially used R formulations (Cox, 2004). When R residues are found in tap water, food or feed, they arise from the total herbicide formulation, which is the most commonly used mixture in agriculture; indeed many authors in the field have strongly emphasized the necessity of studying the potential toxic effects of total chemical mixtures rather than single components (Cox and Surgan, 2006; Mesnage et al., 2010; Monosson, 2005). Even adjuvants and not only glyphosate or other active ingredients are found in ground water (Krogh et al., 2002), and thus an exposure to the diluted whole formulation is more representative of an environmental pollution than the exposure to glyphosate alone in order to study health effects.

With a view to address this lack of information, we have performed a 2 year detailed rat feeding study. The actual guideline 408 of the Organization for Economic Co-operation and Development (OECD) was followed by some manufacturers for GMOs even if it was not designed for that purpose. We have explored more parameters and more frequently than recommended in this standard (Table 1) in a long-term experiment. This allowed us to follow in details potential health effects and their possible origins due to the direct or indirect consequences of the genetic modification itself in GMOs, or due to the formulated herbicide mixture used on GMOs (and not glyphosate alone), or both. Because of recent reviews on GMOs (Domingo and Giné Bordonaba, 2011; Snell et al., 2011) we had no reason to settle at first for a carcinogenesis protocol using 50 rats per group. However we have prolonged the biochemical and hematological measurements or disease status recommended in combined chronic studies using 10 rats per group (up to 12 months in OECD 453). This remains the highest number of rats regularly measured in a standard GMO diet study. We have tested also for the first time 3 doses (rather than two in the usual 90 day long protocols) of the R-tolerant NK603 GM maize alone, the GM maize treated with R, and R alone at very low environmentally relevant doses starting below the range of levels permitted by regulatory authorities in drinking water and in GM feed.

## 2. Materials and methods

### 2.1. Ethics

The experimental protocol was conducted in accordance with the regulations of our ethics in an animal care unit authorized by the French Ministries of Agriculture and Research (Agreement Number A35–288-1). Animal experiments were performed according to ethical guidelines of animal experimentations (CEE 86/609 regulation). Concerning field studies of plant species, no specific permits were required, nor for the locations/activities. The maize grown (MON-00603-6 commonly named NK603) was authorized for unconfined release into the environment and use as a livestock feed by the Canadian Food Inspection Agency (Decision Document 2002-35). We confirm that the location is not privately-owned or protected in any way and that the field studies did not involve endangered or protected species. The GM maize was authorized for import into the European Union (CE 258/97 regulation).

### 2.2. Plants, diets and chemicals

The varieties of maize used in this study were the R-tolerant NK603 (Monsanto Corp., USA), and its nearest isogenic non-transgenic control. These two types of maize were grown under similar normal conditions, in the same location, spaced at a sufficient distance to avoid cross-contamination. The genetic nature, as well as the purity of the GM seeds and harvested material, was confirmed by qPCR analysis of DNA samples. One field of NK603 was treated with R at 3 L ha$^{-1}$ (Weather-MAX, 540 g/L of glyphosate, EPA Reg. 524-537), and another field of NK603 was not treated with R. Corns were harvested when the moisture content was less than 30% and were dried at a temperature below 30 °C. From these three cultivations of

## Table 1
Protocol used and comparison to existing assessment, and to non-mandatory regulatory tests.

| Treatments and analyses | In this work | Hammond et al., 2004 | Regulatory tests |
|---|---|---|---|
| Treatments + controls | GMO NK603, GMO NK603 + Roundup, Roundup, and closest isogenic maize | GMO NK603 + Roundup, closest isogenic maize, and six other maize lines non substantially equivalent | GMOs or chemicals (in standard diet or water) |
| Doses by treatment | 3 | 2 | At least 3 |
| Duration in months | 24 (chronic) | 3 (subchronic: 13 weeks) | 3 |
| Animals measured/group/sex | 10/10 SD rats (200 rats measured) | 10/20 SD rats (200 rats measured/total 400) | At least 10 rodents |
| Animals by cage (same sex) | 1–2 | 1 | 1 or more |
| Monitoring/week | 2 | 1 | 1 or more |
| Feed and water consumptions | Measured | For feed only | At least feed |
| Organs and tissues studied | | | For high dose and controls |
| Histology/animal | 34 | 17/36 | At least 30 |
| Organs weighted | 10 | 7 | At least 8 |
| Electronic microscopy | Yes | No | No |
| Behavioral studies (times) | 2 | 1 (no protocol given) | 1 |
| Ophtalmology (times) | 2 | 0 | 2 |
| Number of blood samples/animal | 11, each month (0–3) then every 3 months | 2, weeks 4 and 13 | 1, at the end |
| Blood parameters | 31 (11 times for most) | 31 (2 times) | At least 25 (at least 2 times) |
| Plasma sex steroids | Testosterone, estradiol | No | No, except if endocrine effects suspected |
| Liver tissue parameters | 6 | 0 | 0 |
| Number of urine samples | 11 | 2 | Optional, last week |
| Urine parameters studied | 16 | 18 | 7 if performed |
| Microbiology in feces or urine | Yes | Yes | No |
| Roundup residues in tissues | Studied | Not studied | Not mandatory |
| Transgene in tissues | Studied | Not studied | Not studied |

The protocol used in this work was compared to the regulatory assessment of NK603 maize by the company (Hammond et al., 2004), and to non mandatory regulatory in vivo tests for GMOs, or mandatory for chemicals (OECD 408). Most relevant results are shown in this paper.

Please cite this article in press as: Séralini, G.-E., et al. Long term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize. Food Chem. Toxicol. (2012), http://dx.doi.org/10.1016/j.fct.2012.08.005

G.-E. Séralini et al./Food and Chemical Toxicology xxx (2012) xxx–xxx                                                                 3

maize, laboratory rat chow was made based on the standard diet A04 (Safe, France). The dry rat feed was made to contain 11, 22 or 33% of GM maize, cultivated either with or without R, or 33% of the non-transgenic control line. The concentrations of the transgene were confirmed in the three doses of each diet by qPCR. All feed formulations consisted in balanced diets, chemically measured as substantially equivalent except for the transgene, with no contaminating pesticides over standard limits. All secondary metabolites cannot be known and measured in the composition. However we have measured isoflavones and phenolic acids including ferulic acid by standard HPLC-UV. All reagents used were of analytical grade. The herbicide diluted in the drinking water was the commercial formulation of R (GT Plus, 450 g/L of glyphosate, approval 2020448, Monsanto, Belgium). Herbicides levels were assessed by glyphosate measurements in the different dilutions by mass spectrometry.

### 2.3. Animals and treatments

Virgin albino Sprague-Dawley rats at 5 weeks of age were obtained from Harlan (Gannat, France). All animals were kept in polycarbonate cages (820 cm², Genestil, France) with two animals of the same sex per cage. The litter (Toplit classic, Safe, France) was replaced twice weekly. The animals were maintained at $22 \pm 3$ °C under controlled humidity (45–65%) and air purity with a 12 h-light/dark cycle, with free access to food and water. The location of experimental room was standardized. After a 20 days period of acclimatization, 100 male and 100 female animals were randomly assigned on a weight basis into 10 equivalent groups. For each sex, one control group had access to plain water and standard diet from the closest isogenic non-transgenic maize control; six groups were fed with 11, 22 and 33% of GM NK603 maize either treated or not with R. The final three groups were fed with the control diet and had access to water supplemented with respectively $1.1 \times 10^{-8}$% of R (0.1 ppb of R or 50 ng/L of glyphosate, the contaminating level of some regular tap waters), 0.09% of R (400 mg/kg, US MRL of glyphosate in some GM feed) and 0.5% of R (2.25 g/L, half of the minimal agricultural working dilution). This was changed weekly. Twice weekly monitoring allowed careful observation and palpation of animals, recording of clinical signs, measurement of any tumors that may arise, food and water consumption, and individual body weights.

### 2.4. Biochemical analyses

Blood samples were collected from the tail vein of each rat under short isoflurane anesthesia before treatment and after 1, 2, 3, 6, 9, 12, 15, 18, 21 and 24 months: 11 measurements were obtained for each animal alive at 2-years. It was first demonstrated that anesthesia did not impact animal health. Two aliquots of plasma and serum were prepared and stored at −80° C. Then 31 parameters were assessed (Table 1) according to standard methods including hematology and coagulation parameters, albumin, globulin, total protein concentration, creatinine, urea, calcium, sodium, potassium, chloride, inorganic phosphorus, triglycerides, glucose, total cholesterol, alanine aminotransferase, aspartate aminotransferase, gamma glutamyl-transferase (GT), estradiol, testosterone. In addition, at months 12 and 24 the C-reactive protein was assayed. Urine samples were collected similarly 11 times, over 24 h in individual metabolic cages, and 16 parameters were quantified including creatinine, phosphorus, potassium, chloride, sodium, calcium, pH and clairance. Liver samples at the end made it possible to perform assays of CYP1A1, 1A2, 3A4, 2C9 activities in S9 fractions, with glutathione S- transferase and gamma-GT.

### 2.5. Anatomopathology

Animals were sacrificed during the course of the study only if necessary because of suffering according to ethical rules (such as 25% body weight loss, tumors over 25% body weight, hemorrhagic bleeding, or prostration), and at the end of the study by exsanguination under isoflurane anesthesia. In each case, the following organs were collected: brain, colon, heart, kidneys, liver, lungs, ovaries, spleen, testes, adrenals, epididymis, prostate, thymus, uterus, aorta, bladder, bone, duodenum, esophagus, eyes, ileum, jejunum, lymph nodes, lymphoreticular system, mammary glands, pancreas, parathyroid glands, Peyer's patches, pituitary, salivary glands, sciatic nerve, skin, spinal cord, stomach, thyroid and trachea. The first 14 organs (at least 10 per animal depending on the sex, Table 1) were weighted, plus any tumor that arose. The first nine organs were divided into two parts and one half was immediately frozen in liquid nitrogen/carbonic ice. The remaining parts including other organs were rinsed in PBS and stored in 4% formalin before anatomopathological study. These samples were used for further paraffin-embedding, slides and HES histological staining. For transmission electron microscopy, kidneys, livers and tumors were cut into 1 mm³ fragments. Samples were fixed in pre-chilled 2% paraformaldehyde/2.5% glutaraldehyde in 0.1 M PBS pH 7.4 at 4 °C for 3 h and processed as previously described (Malatesta et al., 2002a).

### 2.6. Statistical analysis

Biochemical data were treated by multivariate analysis with the SIMCA-P (V12) software (UMETRICS AB Umea, Sweden). The use of chemometrics tools, for example, principal component analysis (PCA), partial least-squares to latent structures (PLS), and orthogonal PLS (OPLS), are robust methods for modeling, analyzing and interpreting complex chemical and biological data. OPLS is a recent modification of the PLS method. PLS is a regression method used in order to find the relationship between two data tables referred to as X and Y. PLS regression (Eriksson et al., 2006b) analysis consists in calculating by means of successive iterations, linear combinations of the measured X-variables (predictor variables). These linear combinations of X-variables give PLS components (score vectors t). A PLS component can be thought of as a new variable – a latent variable – reflecting the information in the original X-variables that is of relevance for modeling and predicting the response Y-variable by means of the maximization of the square of covariance (Max cov²(X,Y)). The number of components is determined by cross validation. SIMCA software uses the Nonlinear Iterative Partial Least Squares algorithm (NIPALS) for the PLS regression. Orthogonal Partial Least Squares Discriminant Analysis (OPLS-DA) was used in this study (Weljie et al., 2011; Wiklund et al., 2008). The purpose of Discriminant Analysis is to find a model that separates groups of observations on the basis of their X variables. The X matrix consists of the biochemical data. The Y matrix contains dummy variables which describe the group membership of each observation. Binary variables are used in order to encode a group identity. Discriminant analysis finds a discriminant plan in which the projected observations are well separated according to each group. The objective of OPLS is to divide the systematic variation in the X-block into two model parts, one linearly related to Y (in the case of a discriminant analysis, the group membership), and the other one unrelated (orthogonal) to Y. Components related to Y are called predictive, and those unrelated to Y are called orthogonal. This partitioning of the X data results in improved model transparency and interpretability (Eriksson et al., 2006a). Prior to analysis, variables were mean-centered and unit variance scaled.

## 3. Results

### 3.1. Mortality

Control male animals survived on average $624 \pm 21$ days, whilst females lived for $701 \pm 20$, during the experiment, plus in each case 5 weeks of age at the beginning and 3 weeks of stabilization period. After mean survival time had elapsed, any deaths that occurred were considered to be largely due to aging. Before this period, 30% control males (three in total) and 20% females (only two) died spontaneously, while up to 50% males and 70% females died in some groups on diets containing the GM maize (Fig. 1). However, the rate of mortality was not proportional to the treatment dose, reaching a threshold at the lowest (11%) or intermediate (22%) amounts of GM maize in the equilibrated diet, with or without the R application on the plant. It is noteworthy that the first two male rats that died in both GM treated groups had to be euthanized due to kidney Wilm's tumors that were over 25% of body weight. This was at approximately a year before the first control animal died. The first female death occurred in the 22% GM maize feeding group and resulted from a mammary fibroadenoma 246 days before the first control. The maximum difference in males was 5 times more deaths occurring during the 17th month in the group consuming 11% GM maize, and in females 6 times greater mortality during the 21st month on the 22% GM maize diet with and without R. In the female cohorts, there were 2–3 times more deaths in all treated groups compared to controls by the end of the experiment and earlier in general. Females were more sensitive to the presence of R in drinking water than males, as evidenced by a shorter lifespan. The general causes of death represented in histogram format (Fig. 1) are linked mostly to large mammary tumors in females, and other organic problems in males.

### 3.2. Anatomopathological observations

All rats were carefully monitored for behavior, appearance, palpable tumors, infections, during the experiment, and at least 10 organs per animal were weighted and up to 34 analyzed post mortem, at the macroscopic and/or microscopic levels (Table 1).

Please cite this article in press as: Séralini, G.-E., et al. Long term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize. Food Chem. Toxicol. (2012), http://dx.doi.org/10.1016/j.fct.2012.08.005

4                                    G.-E. Séralini et al./Food and Chemical Toxicology xxx (2012) xxx–xxx



**Fig. 1.** Mortality of rats fed GMO treated or not with Roundup, and effects of Roundup alone. Rats were fed with NK603 GM maize (with or without application of Roundup) at three different doses (11, 22, 33% in their diet: thin, medium and bold lines, respectively) compared to the substantially equivalent closest isogenic non-GM maize (control, dotted line). Roundup was administered in drinking water at 3 increasing doses, same symbols (environmental A, MRL in agricultural GMOs B and half of minimal agricultural levels (C), see Section 2). Lifespan during the experiment for the control group is represented by the vertical bar ± SEM (grey area). In bar histograms, the causes of mortality before the grey area are detailed in comparison to the controls (0). In black are represented the necessary euthanasia because of suffering in accordance with ethical rules (tumors over 25% body weight, more than 25% weight loss, hemorrhagic bleeding, etc.); and in hatched areas, spontaneous mortality.

All data cannot be shown in one report, and the most relevant are described here. There was no rejection by the animals of the diet with or without GMOs, nor any major difference in the body weight.

The largest palpable growths (above a diameter of 17.5 mm in females and 20 mm in males) were found to be in 95% of cases non-regressive tumors, and were not infectious nodules. These growths progressively increased in size and number, but not proportionally to the treatment dose over the course of the experiment (Fig. 2). As in the case of rates of mortality, this suggests that a threshold in effect was reached at the lowest doses. They were rarely equal but almost always more frequent than in controls for all treated groups, often 2–3 times more in both sexes. Tumors began to reach a large size on average 94 days before in treated females, and up to 600 days earlier in 2 male groups eating the GM maize (11 and 22% with or without R).

In female animals, the largest tumors were in total 5 times more frequent than in males after 2 years, with 93% being mammary tumors. Adenomas, fibroadenomas and carcinomas were deleterious to health due to a very large size, rather than the grade of the tumor itself. Large tumor size caused impediments to either breathing or nutrition and digestion because of their thoracic or abdominal location and also resulted in hemorrhaging. In addition, one metastatic ovarian cystadenocarcinoma and two skin tumors were identified. Metastases were observed in only 2 cases; one in a group fed with 11% GM maize, and another in the highest dose of R treatment group.

Up to 14 months, no animals in the control groups showed any signs of tumors whilst 10–30% of treated females per group developed tumors, with the exception of one group (33% GMO + R). By the beginning of the 24th month, 50–80% of female animals had developed tumors in all treated groups, with up to 3 tumors per animal, whereas only 30% of controls were affected. The R treatment groups showed the greatest rates of tumor incidence with 80% of animals affected with up to 3 tumors for one female, in each group. A summary of all mammary tumors at the end of the experiment, independent of the size, is presented in Table 2. The same trend was observed in the groups receiving R in their drinking water; all females except one (with metastatic ovarian carcinoma) presented, in addition mammary hypertrophies and in some cases hyperplasia with atypia (Table 2).

The second most affected organ in females was the pituitary gland, in general around 2 times more than in controls for most treatments (Table 2). At this level again, adenomas and/or hyper-

Please cite this article in press as: Séralini, G.-E., et al. Long term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize. Food Chem. Toxicol. (2012), http://dx.doi.org/10.1016/j.fct.2012.08.005



**Fig. 2.** Largest non-regressive tumors in rats fed GMO treated or not by Roundup, and effects of Roundup alone. The symbols of curves and treatments are explained in the caption of Fig. 1. The largest tumors were palpable during the experiment and numbered from 20 mm in diameter for males and 17.5 mm for females. Above this size, 95% of growths were non-regressive tumors. Summary of all tumors are shown in the bar histograms: black, non regressive largest tumors; white, small internal tumors; grey, metastases.

**Table 2**
Summary of the most frequent anatomical pathologies observed.

| Organs and associated pathologies | Controls | GMO 11% | GMO 22% | GMO 33% | GMO 11% + R | GMO 22% + R | GMO 33% + R | R (A) | R (B) | R (C) |
|---|---|---|---|---|---|---|---|---|---|---|
| Males, in liver | 2 (2) | 5 (4) | 11 (7) | 8 (6) | 5 (4) | 7 (4) | 6 (5) | 11 (5) | 9 (7) | 6 (5) |
| In hepatodigestive tract | 6 (5) | 10 (6) | 13 (7) | 9 (6) | 9 (6) | 13 (6) | 11 (7) | 23 (9) | 16 (8) | 9 (5) |
| Kidneys, CPN | 3 (3) | 4 (4) | 5 (5) | 7 (7) | 5 (5) | 4 (4) | 4 (4) | 6 (6) | 5 (5) | 3 (3) |
| Females, mammary tumors | 8 (5) | 15 (7) | 10 (7) | 15 (8) | 10 (6) | 11 (7) | 13 (9) | 20 (9) | 16 (10) | 12 (9) |
| In mammary glands | 10 (5) | 22 (8) | 10 (7) | 16 (8) | 17 (8) | 16 (8) | 15 (9) | 26 (10) | 20 (10) | 18 (9) |
| Pituitary | 9 (6) | 23 (9) | 20 (8) | 8 (5) | 19 (9) | 9 (4) | 19 (7) | 22 (8) | 16 (7) | 13 (7) |

After the number of pathological abnormalities, the number of rats reached is indicated in parentheses. In male animals pathological signs are liver congestions, macroscopic spots and microscopic necrotic foci. Hepatodigestive pathological signs concern the liver, stomach and small intestine (duodenum, ileum or jejunum). Only marked or severe chronic progressive nephropathies (CPN) are listed, excluding two nephroblastomas in groups consuming GMO 11% and GMO 22% + Roundup. In females, mammary fibroadenomas and adenocarcinomas are the major tumors detected; galactoceles and hyperplasias with atypia are also found and added in mammary glands pathological signs. Pituitary dysfunctions include adenomas, hyperplasias and hypertrophies. For details of the various treatment groups see Fig. 1.

plasias and hypertrophies were noticed. For all R treatment groups, 70–80% of animals presented 1.4–2.4 times more abnormalities than controls in this gland.

The big palpable tumors in males (in kidney, and mostly skin) were by the end of the experimental period on average twice as frequent as in controls, in which one skin fibroma appeared during the 23rd month. At the end of the experiment, internal non-palpable tumors were added, and their sums were lower in males than

in females. They were not really different from controls, although slightly above in females (Histograms Fig. 2).

The most affected organs in males were the liver, together with the hepatodigestive tract and kidneys (Table 2 and Fig. 3). Hepatic congestions, macroscopic and microscopic necrotic foci were 2.5–5.5 times more frequent in all treatments than in control groups. Gamma GT hepatic activity was increased in particular for GMO + R groups (up to 5.4 times), this being probably due to a liver disorder.

Please cite this article in press as: Séralini, G.-E., et al. Long term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize. Food Chem. Toxicol. (2012), http://dx.doi.org/10.1016/j.fct.2012.08.005

6                                      G.-E. Séralini et al./Food and Chemical Toxicology xxx (2012) xxx–xxx



**Fig. 3.** Anatomopathological observations in rats fed GMO treated or not by Roundup, and effects of Roundup alone. Macroscopic and microscopic photographs show male livers (A–E) and left kidneys (F–I'), female mammary glands (J–P) and pituitaries (Q–T), according to Table 2. The number of each animal and its treatment is specified. Macroscopic pale spots (D) and microscopic necrotic foci in liver (C clear-cell focus, E basophilic focus with atypia), and marked or severe chronic progressive nephropathies, are illustrated. In females, mammary tumors (J,J',N adenocarcinoma and K,K',L,L',O,P fibroadenomas) and pituitary adenomas (R–T) are shown and compared to controls (C after the rat number).

In addition, cytochrome activities also generally increased in the presence of R (in drinking water or GM diet) according to the dose up to 5.7 times at the highest dose. Transmission electron microscopic observations of liver samples confirmed changes for all treated groups in relation to glycogen dispersion or appearance in lakes, increase of residual bodies and enlargement of cristae in mitochondria (Fig. 4). The GM maize fed groups either with or without R application (in plants) showed a reduced transcription in mRNA and rRNA because of higher heterochromatin content, and decreased nucleolar dense fibrillar components. In the GMO + R group (at the highest dose) the smooth endoplasmic reticulum was drastically increased and nucleoli decreased in size,

Please cite this article in press as: Séralini, G.-E., et al. Long term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize. Food Chem. Toxicol. (2012), http://dx.doi.org/10.1016/j.fct.2012.08.005

G.-E. Séralini et al./Food and Chemical Toxicology xxx (2012) xxx–xxx



**Fig. 4.** Ultrastructure of hepatocytes in male rats from groups presenting the greatest degree of liver pathology. (1) Typical control rat hepatocyte (Bar 2 μm except in 4). (2) Effects with Roundup at the lowest dose. Glycogen (G) is dispersed in the cytoplasm. L, lipid droplet; N, nucleus; R rough endoplasmic reticulum. (3) Hepatocytes of animal fed GM maize (GMO) at 22% of total diet. Large lakes of glycogen occur in the cytoplasm. M, mitochondria. (4) Details of treatment effects with 22% dietary GMO (Bar 1 μm). (a) Cluster of residual bodies (asterisks). (b) Mitochondria show many enlarged cristae (arrows).

becoming more compact. For R treatment alone similar trends were observed, with a partial resumption of nucleolar activity at the highest dose.

Degenerating kidneys with turgid inflammatory areas demonstrate the increased incidence of marked and severe chronic progressive nephropathies, which were up to 2-fold higher in the 33% GM maize or lowest dose R treatment groups (Table 2 and Fig. 3).

### 3.3. Biochemical analyses

For the different corns and diets, the study of the standard chemical composition revealed no particular difference; this is why they were classified as substantially equivalent, except for transgene DNA quantification. For instance, there was no difference between total isoflavones. In addition, other specific compounds not always requested for substantial equivalence establishment were assayed. Among phenolic acids, the only consistent and significant ($p < 0.01$) results concerned ferulic acid that was decreased in both GM and GM + R diets by 16–30% in comparison to the control diet ($889 \pm 107$, $735 \pm 89$ respectively vs control $1057 \pm 127$ mg/kg) and caffeic acid by 21–53% ($17.5 \pm 2.1$, $10.3 \pm 1.3$ vs control $22.1 \pm 2.6$ mg/kg).

For biochemical measurements in rats, statistical analysis was performed on the results obtained from samples taken at the 15th month time point, as this was the last sampling time when most animals were still alive (in treated groups 90% males, 94% females, and 100% controls). OPLS-DA 2-class models were built between each treated group per sex and controls. Only models with an explained variance $R^2(Y) \geqslant 80\%$, and a cross-validated predictive ability $Q^2(Y) \geqslant 60\%$, were used for selection of the discriminant variables (Fig. 5A), when their regression coefficients were significant at 99% confidence level. Thus, in treated females, kidney failures appeared at the biochemical level (82% of the total disrupted parameters). Ions (Na, Cl) or urea increased in urine. Accordingly, the same ions decreased in serum (Fig. 5B) as did the levels of P, K and Ca. Creatinine or clairance decreased in urine for all treatment groups in comparison to female controls (Table 3). In GM maize treated males (with or without R), 87% of discriminant variables were kidney related, but the disrupted profiles were less obvious because of advanced chronic nephropathies and deaths. In summary, for all treatments and both sexes, 76% of the discriminant variables versus controls were kidney related.

Moreover, in females (Table 3) the androgen/estrogen balance in serum was modified by GM maize and R treatments (at least 95% confidence level, Fig. 5B), and for male animals at the highest R-treatment dose, levels of estrogens were more than doubled.

### 4. Discussion

This report describes the first life-long rodent (rat) feeding study investigating possible toxic effects rising from an R-tolerant

Please cite this article in press as: Séralini, G.-E., et al. Long term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize. Food Chem. Toxicol. (2012), http://dx.doi.org/10.1016/j.fct.2012.08.005

8            *G.-E. Séralini et al./Food and Chemical Toxicology xxx (2012) xxx–xxx*



**Fig. 5.** Orthogonal Partial Least Squares-Discriminant Analysis (OPLS-DA) for biochemical data (females fed 33% GMO versus controls). (A) OPLS-DA regression coefficients for predictive component, with jack-knifed confidence intervals at 99% confidence level, indicate discriminant parameters versus controls at month 15 (Abbreviations: U Urinary, UEx Excreted in urine during 24 h, APPT Activated Partial Thromboplastin Time, MCV Mean Corpuscular Volume, PT Prothrombine Time, RBC Red Blood Cells, ALT ALanine aminoTransferase, MCHC Mean Corpuscular Hemoglobin Concentration, A/G Albumin/Globulin ratio, WBC White Blood Cells, AST aspartate aminotransferase). (B) In this case, detailed examples of significant discriminant variables distribution between females fed 33% GMO (bold line) and controls (dotted line). On x axis: animals; on y axis: serum or urine biochemical values for Na, Cl, estradiol, testosterone. Profiles evidence kidney ion leakages and sex hormonal imbalance versus controls.

GM maize (NK603) and a complete commercial formulation of R-herbicide.

Our data show that, as is often the case for hormonal diseases, most observed effects in this study were not proportional to the dose of the treatment (GM maize with and without R application; R alone), non-monotonic and with a threshold effect (Vandenberg et al., 2012). Similar degrees of pathological symptoms were noticed in this study to occur from the lowest to the highest doses suggesting a threshold effect. This corresponds to levels likely to

arise from consumption or environmental exposure, such as either 11% GM maize in food, or 50 ng/L of glyphosate in R-formulation as can be found in some contaminated drinking tap waters, and which fall within authorized limits.

The lifespan of the control group of animals corresponded to the mean rat lifespan, but as is frequently the case with most mammals including humans (WHO, 2012), males on average died before females, except for some female treatment groups. All treatments in both sexes enhanced large tumor incidence by 2–3-fold in com-

Please cite this article in press as: Séralini, G.-E., et al. Long term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize. Food Chem. Toxicol. (2012), http://dx.doi.org/10.1016/j.fct.2012.08.005

G.-E. Séralini et al./Food and Chemical Toxicology xxx (2012) xxx–xxx          9

**Table 3**
Percentage variation of parameters indicating kidney failures of female animals.

| Discriminant variables | | GMO 11% + R | GMO 22% + R | GMO 33% + R | GMO 11% | GMO 22% | GMO 33% | R (A) | R (B) | R (C) |
|---|---|---|---|---|---|---|---|---|---|---|
| Urinary decrease | Clairance | −4 | −11 | −20 | **−20** | **−20** | −19 | **−20** | **−24** | **−40** |
| | Creatinine | −5 | **−32** | **−37** | −19 | −37 | **−36** | −43 | −23 | −1 |
| | Creatinine ex | −5 | **−11** | **−19** | −18 | **−17** | −21 | **−21** | **−22** | **−39** |
| Urinary increase | Urea | 12 | **18** | 15 | 15 | 12 | −1 | 0 | 13 | **32** |
| | Na | 25 | 33 | 30 | 52 | −2 | **95** | **62** | 65 | **91** |
| | Na ex | 24 | 50 | 68 | 50 | 24 | **125** | **108** | 51 | 7 |
| | Cl | 14 | 35 | 28 | 46 | 5 | **101** | **67** | 56 | **94** |
| | Cl ex | 20 | 63 | 70 | 51 | 31 | **138** | **121** | 48 | 13 |
| Serum decrease | Na | 2 | 1 | 1 | −1 | **−4** | **−6** | −7 | 0 | −3 |
| | Cl | −1 | −2 | −2 | −5 | −7 | **−6** | **−8** | −1 | −4 |
| | P | −6 | −11 | −13 | −17 | **−18** | **−20** | **−32** | −9 | −13 |
| | K | 4 | 5 | 10 | 2 | −4 | 0 | −4 | 8 | **−5** |
| | Ca | 4 | 3 | 3 | **2** | −2 | **−5** | −6 | 3 | **−6** |
| Gonads | Estradiol | 8 | −1 | 2 | 5 | −2 | −25 | −26 | **−73** | 39 |
| | Testosterone | 5 | −9 | 27 | **56** | 17 | 81 | **97** | **−72** | 10 |

OPLS-DA was performed on 48 variables at month 15. Here we showed mean differences (%) of variables (discriminant at 99% confidence level, in bold character) indicating kidney parameters of female animals, together with sex hormones. Male kidney pathologies are already illustrated in Table 2.

parison to our controls but also for the number of mammary tumors in comparison to the same Harlan Sprague Dawley strain (Brix et al., 2005), and overall around 3-fold in comparison to the largest study with 1329 Sprague Dawley female rats (Chandra et al., 1992). In our study the tumors also developed considerably faster than the controls, even though the majority of tumors were observed after 18 months. The first large detectable tumors occurred at 4 and 7 months into the study in males and females respectively, underlining the inadequacy of the standard 90 day feeding trials for evaluating GM crop and food toxicity (Séralini et al., 2011).

Suffering inducing euthanasia and deaths corresponded mostly in females to the development of large mammary tumors. These appeared to be clearly related to the various treatments when compared to the control groups. These tumors are generally known to be mostly estrogen-dependent (Harvell et al., 2000). We observed a strikingly marked induction of mammary tumors by R alone, a major formulated pesticide, even at the very lowest dose administered. R has been shown to disrupt aromatase which synthesizes estrogens (Richard et al., 2005), but to also interfere with estrogen and androgen receptors in cells (Gasnier et al., 2009). In addition, R appears to be a sex endocrine disruptor *in vivo*, also in males (Romano et al., 2010). Sex steroids are also modified in treated rats. These hormone-dependent phenomena are confirmed by enhanced pituitary dysfunction in treated females. An estrogen modified feedback mechanism may act at this level (Popovics et al., 2011; Walf and Frye, 2010). The similar pathological profiles provoked by the GM maize containing R residues may thus be explained at least by R residues themselves, knowing that the medium dose of the R treatment corresponds to acceptable levels of this pesticide residues in GMOs.

Interestingly, in the groups of animals fed with the NK603 without R application, similar effects with respect to enhanced tumor incidence and mortality rates were observed. A possible explanation for this finding is the production of specific compound(s) in the GM feed that are either directly toxic and/or cause the inhibition of pathways that in turn generate chronic toxic effects. This is despite the fact that the variety of GM maize used is this study was judged by industry and regulators as being substantially equivalent to the corresponding non-GM closest isogenic line. As the total chemical composition of the GM maize cannot be measured in details, the use of substantial equivalence is insufficient to highlight potential unknown toxins and therefore cannot replace long-term animal feeding trials for GMOs. A cause of the effects of the effects could be that the NK603 GM maize used in this study is engineered to overexpress a modified version of the *Agrobacterium tumefaciens* 5-enolpyruvylshikimate-3-phosphate synthase (EPSPS) (Hammond et al., 2004) allowing the R tolerance. The modified EPSPS is not inhibited by glyphosate by contrast to the wild enzyme. This enzyme is known to drive the first step of aromatic amino acid biosynthesis in the plant shikimate pathway; in addition estrogenic isoflavones and their glycosides are also products of this pathway (Duke et al., 2003). They were not disturbed in our study. By contrast, the levels of caffeic and ferulic acids in the GM diets, which are also secondary metabolites from this pathway, but not always measured in regulatory studies, are significantly reduced. This may lower their protective effects against carcinogenesis and even mammalian tumors (Kuenzig et al., 1984; Baskaran et al., 2010). Moreover, these phenolic acids and in particular ferulic acid may modulate estrogen receptors or the estrogenic pathway in mammalian cells (Chang et al., 2006). This does not exclude the action of other unknown metabolites. This explanation also corresponds to the fact that the observed effects of NK603 and R are not additive and reached a threshold. This implies that both the NK603 maize and R may cause hormonal disturbances in the same biochemical and physiological pathway.

As expected, mammary tumors in males occurred far less frequently than in females. Death in male rats was mostly due to the development of severe hepatorenal insufficiencies, confirming the first signs of toxicity observed in 90 day feeding trials with NK603 maize (Spiroux de Vendômois et al., 2009). In females, kidney ion leakages were evidenced at the biochemical levels at month 15, when severe nephropathies were evidenced in dead male animals afterwards, at the anatomopathological level. Early signs of toxicity at month 3 in kidney and liver were also observed for 19 edible GM crops containing pesticide residues (Séralini et al., 2011). As a matter of fact, only elderly male rats are sensitive to chronic progressive nephropathies (Hard and Khan, 2004). The disturbed kidney parameters may have been induced by the reduction of phenolic acids in our study, since caffeic and ferulic acids are beneficial in the kidney as they prevent oxidative stress (Srinivasan et al., 2005; U Rehman and Sultana, 2011). Accordingly, we previously demonstrated that plant extracts containing ferulic and caffeic acids were able to promote detoxification of embryonic kidney cells after R contamination (Gasnier et al., 2011). It is thus possible that NK603 consumption by reducing these compounds may well provoke an early aging of kidney physiology in this study, like R by oxidative stress.

Disturbances that we found to occur in the male liver are characteristic of a chronic intoxication, confirmed by alterations

Please cite this article in press as: Séralini, G.-E., et al. Long term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize. Food Chem. Toxicol. (2012), http://dx.doi.org/10.1016/j.fct.2012.08.005

in biochemical liver and kidney function parameters. The observation that liver function in female animals is less affected may be due to their physiology being better adapted to estrogen metabolism. Furthermore, liver enzymes have been clearly demonstrated as sex-specific in their expression patterns, including in a 90-day rat feeding trial of NK603 maize (Spiroux de Vendômois et al., 2009). However, in a long-term study, evidence of early liver aging was observed in female mice fed with R-tolerant GM soy (Malatesta et al., 2008a). In the present investigation, deeper analysis at an ultrastructural level revealed evidence of impediments in transcription and other defects in cell nuclear structure that were comparable in both sexes, and dose-dependent in hepatocytes in all treatments. This is consistent with the well-documented toxic effect of very low dilutions of R on apoptosis, mitochondrial function, and cell membrane degradation inducing necrosis of hepatocytes, and other cell lines (Benachour and Seralini, 2009; Benachour et al., 2007; Gasnier et al., 2010; Peixoto, 2005).

The disruptions of at least the estrogen-related pathways and/ or enhancement of oxidative stress by all treatments need further investigations. This can be addressed through the application of transcriptomic, proteomic and metabolomic methods to analyze the molecular profiles of kidneys and livers, as well as the GM NK603 maize (Jiao et al., 2010; Zhou et al., 2009; Zolla et al., 2008). Other possible causes of observed pathogenic effects may be due to disturbed gene expression resulting from the transgene insertional, general mutagenic or metabolic effects (Latham et al., 2006; Wilson et al., 2006) as has been shown for MON810 GM maize (Rosati et al., 2008). A consequent disruption of general metabolism in the GMO cannot be excluded, which could lead, for example, to the production of other potentially active compounds such as miRNAs (Zhang et al., 2012) or leukotoxin diols (Markaverich et al., 2005).

In conclusion, it was previously known that glyphosate consumption in water above authorized limits may provoke hepatic and kidney failures (EPA). The results of the study presented here clearly demonstrate that lower levels of complete agricultural glyphosate herbicide formulations, at concentrations well below officially set safety limits, induce severe hormone-dependent mammary, hepatic and kidney disturbances. Similarly, disruption of biosynthetic pathways that may result from overexpression of the EPSPS transgene in the GM NK603 maize can give rise to comparable pathologies that may be linked to abnormal or unbalanced phenolic acids metabolites, or related compounds. Other mutagenic and metabolic effects of the edible GMO cannot be excluded. This will be the subject of future studies, including transgene and glyphosate presence in rat tissues. Reproductive and multigenerational studies will also provide novel insights into these problems. This study represents the first detailed documentation of long-term deleterious effects arising from the consumption of a GM R-tolerant maize and of R, the most used herbicide worldwide.

Altogether, the significant biochemical disturbances and physiological failures documented in this work confirm the pathological effects of these GMO and R treatments in both sexes, with different amplitudes. We propose that agricultural edible GMOs and formulated pesticides must be evaluated very carefully by long term studies to measure their potential toxic effects.

## Conflict of Interest

The authors declare that there are no conflicts of interest.

## Acknowledgments

We thank Michael Antoniou for English assistance and constructive comments on the manuscript, as well as Herrade Hemmerdinger for proofreading. We gratefully acknowledge the Association CERES, the Foundation "Charles Leopold Mayer pour le Progrès de l'Homme", the French Ministry of Research, and CRI-IGEN for their major support.

## References

Baskaran, N., Manoharan, S., Balakrishnan, S., Pugalendhi, P., 2010. Chemopreventive potential of ferulic acid in 7,12-dimethylbenz[a]anthracene-induced mammary carcinogenesis in Sprague-Dawley rats. Eur. J. Pharmacol. 637, 22–29.

Benachour, N., Seralini, G.E., 2009. Glyphosate formulations induce apoptosis and necrosis in human umbilical, embryonic, and placental cells. Chem. Res. Toxicol. 22, 97–105.

Benachour, N., Sipahutar, H., Moslemi, S., Gasnier, C., Travert, C., Seralini, G.E., 2007. Time- and dose-dependent effects of Roundup on human embryonic and placental cells. Arch. Environ. Contam. Toxicol. 53, 126–133.

Brix, A.E., Nyska, A., Haseman, J.K., Sells, D.M., Jokinen, M.P., Walker, N.J., 2005. Incidences of selected lesions in control female Harlan Sprague-Dawley rats from two-year studies performed by the National Toxicology Program. Toxicol. Pathol. 33, 477–483.

Chandra, M., Riley, M.G., Johnson, D.E., 1992. Spontaneous neoplasms in aged Sprague-Dawley rats. Arch. Toxicol. 66, 496–502.

Chang, C.J., Chiu, J.H., Tseng, L.M., Chang, C.H., Chien, T.M., Wu, C.W., Lui, W.Y., 2006. Modulation of HER2 expression by ferulic acid on human breast cancer MCF7 cells. Eur. J. Clin. Invest. 36, 588–596.

Cox, C., 2004. Herbicide factsheet – Glyphosate. J. pestic. reform 24, 10–15.

Cox, C., Surgan, M., 2006. Unidentified inert ingredients in pesticides: implications for human and environmental health. Environ. Health Perspect. 114, 1803–1806.

Domingo, J.L., Giné Bordonaba, J., 2011. A literature review on the safety assessment of genetically modified plants. Environ. Int. 37, 734–742.

Duke, S.O., Rimando, A.M., Pace, P.F., Reddy, K.N., Smeda, R.J., 2003. Isoflavone, glyphosate, and aminomethylphosphonic acid levels in seeds of glyphosate-treated, glyphosate-resistant soybean. J. Agric. Food. Chem. 51, 340–344.

EPA, 2012. Basic Information about Glyphosate in Drinking Water. <http:// water.epa.gov/drink/contaminants/basicinformation/glyphosate.cfm> (Last access June).

Eriksson, L., Johansson, E., Kettaneh-Wold, N., Trygg, J., Wikström, C., Wold, S., 2006a. Multi- and Megavariate Data Analysis Part II Advanced Applications and Method Extensions. Umetrics, Umea, Sweden.

Eriksson, L., Johansson, E., kettaneh-Wold, N., Wold, S., 2006b. Multi and Megavariate Data Analysis Part I – Principles and Applications. Umetrics AB, Umea, Sweden.

Gasnier, C., Benachour, N., Clair, E., Travert, C., Langlois, F., Laurant, C., Decroix-Laporte, C., Séralini, G.-E., 2010. Dig1 protects against cell death provoked by glyphosate-based herbicides in human cell lines. J. Occup. Med. Toxicol. 5, 29.

Gasnier, C., Dumont, C., Benachour, N., Clair, E., Chagnon, M.C., Seralini, G.E., 2009. Glyphosate-based pesticides are toxic and endocrine disruptors in human cell lines. Toxicology 262, 184–191.

Gasnier, C., Laurant, C., Decroix-Laporte, C., Mesnage, R., Clair, E., Travert, C., Séralini, G.E., 2011. Defined plant extracts can protect human cells against lethal combined xenobiotic effects. J. Occup. Med. Toxicol. 6, 3.

Hammond, B., Dudek, R., Lemen, J., Nemeth, M., 2004. Results of a 13 week safety assurance study with rats fed grain from glyphosate tolerant corn. Food Chem. Toxicol. 42, 1003–1014.

Hammond, B., Lemen, J., Dudek, R., Ward, D., Jiang, C., Nemeth, M., Burns, J., 2006a. Results of a 90 day safety assurance study with rats fed grain from corn rootworm-protected corn. Food Chem. Toxicol. 44, 147–160.

Hammond, B.G., Dudek, R., Lemen, J.K., Nemeth, M.A., 2006b. Results of a 90 day safety assurance study with rats fed grain from corn borer-protected corn. Food Chem. Toxicol. 44, 1092–1099.

Hard, G.C., Khan, K.N., 2004. A contemporary overview of chronic progressive nephropathy in the laboratory rat, and its significance for human risk assessment. Toxicol. Pathol. 32, 171–180.

Harvell, D.M., Strecker, T.E., Tochacek, M., Xie, B., Pennington, K.L., McComb, R.D., Roy, S.K., Shull, J.D., 2000. Rat strain-specific actions of 17beta-estradiol in the mammary gland: correlation between estrogen-induced lobuloalveolar hyperplasia and susceptibility to estrogen-induced mammary cancers. Proc. Natl. Acad. Sci. USA 97, 2779–2784.

Jiao, Z., Si, X.X., Li, G.K., Zhang, Z.M., Xu, X.P., 2010. Unintended compositional changes in transgenic rice seeds (Oryza sativa L.) studied by spectral and chromatographic analysis coupled with chemometrics methods. J. Agric. Food. Chem. 58, 1746–1754.

Krogh, K.A., Vejrup, K.V., Mogensen, B.B., Halling-Sørensen, B., 2002. Liquid chromatography-mass spectrometry method to determine alcohol ethoxylates and alkylamine ethoxylates in soil interstitial water, ground water and surface water samples. J. Chromatogr. A 957, 45–57.

Kuenzig, W., Chau, J., Norkus, E., Holowaschenko, H., Newmark, H., Mergens, W., Conney, A.H., 1984. Caffeic and ferulic acid as blockers of nitrosamine formation. Carcinogenesis 5, 309–313.

Latham, J.R., Wilson, A.K., Steinbrecher, R.A., 2006. The mutational consequences of plant transformation. J. Biomed. Biotechnol. 2006, 25376.

G.-E. Séralini et al./Food and Chemical Toxicology xxx (2012) xxx–xxx    11

Malatesta, M., Boraldi, F., Annovi, G., Baldelli, B., Battistelli, S., Biggiogera, M., Quaglino, D., 2008a. A long-term study on female mice fed on a genetically modified soybean: effects on liver ageing. Histochem. Cell Biol. 130, 967–977.

Malatesta, M., Caporaloni, C., Gavaudan, S., Rocchi, M.B., Serafini, S., Tiberi, C., Gazzanelli, G., 2002a. Ultrastructural morphometrical and immunocytochemical analyses of hepatocyte nuclei from mice fed on genetically modified soybean. Cell Struct. Funct. 27, 173–180.

Malatesta, M., Caporaloni, C., Rossi, L., Battistelli, S., Rocchi, M.B., Tonucci, F., Gazzanelli, G., 2002b. Ultrastructural analysis of pancreatic acinar cells from mice fed on genetically modified soybean. J. Anat. 201, 409–415.

Malatesta, M., Perdoni, F., Santin, G., Battistelli, S., Muller, S., Biggiogera, M., 2008b. Hepatoma tissue culture (HTC) cells as a model for investigating the effects of low concentrations of herbicide on cell structure and function. Toxicol. In Vitro 22, 1853–1860.

Markaverich, B.M., Crowley, J.R., Alejandro, M.A., Shoulars, K., Casajuna, N., Mani, S., Reyna, A., Sharp, J., 2005. Leukotoxin diols from ground corncob bedding disrupt estrous cyclicity in rats and stimulate MCF-7 breast cancer cell proliferation. Environ. Health Perspect. 113, 1698–1704.

Mesnage, R., Clair, E., Séralini, G.-E., 2010. Roundup in Genetically modified crops: Regulation and toxicity in mammals. Theorie in der Ökologie 16, 31–33.

Monosson, E., 2005. Chemical mixtures: considering the evolution of toxicology and chemical assessment. Environ. Health Perspect. 113, 383–390.

Peixoto, F., 2005. Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation. Chemosphere 61, 1115–1122.

Popovics, P., Rekasi, Z., Stewart, A.J., Kovacs, M., 2011. Regulation of pituitary inhibin/activin subunits and follistatin gene expression by GnRH in female rats. J. Endocrinol. 210, 71–79.

Richard, S., Moslemi, S., Sipahutar, H., Benachour, N., Seralini, G.E., 2005. Differential effects of glyphosate and roundup on human placental cells and aromatase. Environ. Health Perspect. 113, 716–720.

Romano, M.A., Romano, R.M., Santos, L.D., Wisniewski, P., Campos, D.A., de Souza, P.B., Viau, P., Bernardi, M.M., Nunes, M.T., de Oliveira, C.A., 2012. Glyphosate impairs male offspring reproductive development by disrupting gonadotropin expression. Arch. Toxicol. 86, 663–673.

Romano, R.M., Romano, M.A., Bernardi, M.M., Furtado, P.V., Oliveira, C.A., 2010. Prepubertal exposure to commercial formulation of the herbicide glyphosate alters testosterone levels and testicular morphology. Arch. Toxicol. 84, 309–317.

Rosati, A., Bogani, P., Santarlasci, A., Buiatti, M., 2008. Characterisation of 3′ transgene insertion site and derived mRNAs in MON810 YieldGard maize. Plant Mol. Biol. 67, 271–281.

Séralini, G.-E., Cellier, D., de Vendomois, J.S., 2007. New analysis of a rat feeding study with a genetically modified maize reveals signs of hepatorenal toxicity. Arch. Environ. Contam. Toxicol. 52, 596–602.

Séralini, G.-E., Mesnage, R., Clair, E., Gress, S., Spiroux De Vendomois, J., Cellier, D., 2011. Genetically modified crops safety assessments: present limits and possible improvements. Environ. Sci. Eur., 23.

Séralini, G.E., Spiroux de Vendomois, J., Cellier, D., Sultan, C., Buiatti, M., Gallagher, L., Antoniou, M., Dronamraju, K.R., 2009. How subchronic and chronic health effects can be neglected for GMOs, pesticides or chemicals? Int. J. Biol. Sci. 5, 438–443.

Snell, C., Bernheim, A., Bergé, J.-B., Kuntz, M., Pascal, G., Paris, A., Ricroch, A.E., 2011. Assessment of the health impact of GM plant diets in long-term and multigenerational animal feeding trials: a literature review. Food Chem. Toxicol. 50, 1134–1148.

Spiroux de Vendômois, J., Cellier, D., Velot, C., Clair, E., Mesnage, R., Seralini, G.E., 2010. Debate on GMOs health risks after statistical findings in regulatory tests. Int. J. Biol. Sci. 6, 590–598.

Spiroux de Vendômois, J., Roullier, F., Cellier, D., Seralini, G.E., 2009. A comparison of the effects of three GM corn varieties on mammalian health. Int. J. Biol. Sci. 5, 706–726.

Srinivasan, M., Rukkumani, R., Ram Sudheer, A., Menon, V.P., 2005. Ferulic acid, a natural protector against carbon tetrachloride-induced toxicity. Fundam. Clin. Pharmacol. 19, 491–496.

U Rehman, M., Sultana, S., 2011. Attenuation of oxidative stress, inflammation and early markers of tumor promotion by caffeic acid in Fe-NTA exposed kidneys of Wistar rats. Mol. Cell. Biochem. 357, 115–124.

Vandenberg, L.N., Colborn, T., Hayes, T.B., Heindel, J.J., Jacobs Jr., D.R., Lee, D.H., Shioda, T., Soto, A.M., Vom Saal, F.S., Welshons, W.V., Zoeller, R.T., Myers, J.P., 2012. Hormones and endocrine-disrupting chemicals: low-dose effects and nonmonotonic dose responses. Endocr. Rev. 33, 378–455.

Walf, A.A., Frye, C.A., 2010. Raloxifene and/or estradiol decrease anxiety-like and depressive-like behavior, whereas only estradiol increases carcinogen-induced tumorigenesis and uterine proliferation among ovariectomized rats. Behav. Pharmacol. 21, 231–240.

Weljie, A.M., Bondareva, A., Zang, P., Jirik, F.R., 2011. $^1$H NMR metabolomics identification of markers of hypoxia-induced metabolic shifts in a breast cancer model system. J. Biomol. NMR 49, 185–193.

WHO, 2012. World Health Statistics. WHO Press. <http://who.int> (Last access August).

Wiklund, S., Johansson, E., Sjostrom, L., Mellerowicz, E.J., Edlund, U., Shockcor, J.P., Gottfries, J., Moritz, T., Trygg, J., 2008. Visualization of GC/TOF-MS-based metabolomics data for identification of biochemically interesting compounds using OPLS class models. Anal. Chem. 80, 115–122.

Williams, G.M., Kroes, R., Munro, I.C., 2000. Safety evaluation and risk assessment of the herbicide Roundup and its active ingredient, glyphosate, for humans. Regul. Toxicol. Pharmacol. 31, 117–165.

Wilson, A.K., Latham, J.R., Steinbrecher, R.A., 2006. Transformation-induced mutations in transgenic plants: analysis and biosafety implications. Biotechnol. Genet. Eng. Rev. 23, 209–237.

Zhang, L., Hou, D., Chen, X., Li, D., Zhu, L., Zhang, Y., Li, J., Bian, Z., Liang, X., Cai, X., Yin, Y., Wang, C., Zhang, T., Zhu, D., Zhang, D., Xu, J., Chen, Q., Ba, Y., Liu, J., Wang, Q., Chen, J., Wang, J., Wang, M., Zhang, Q., Zhang, J., Zen, K., Zhang, C.Y., 2012. Exogenous plant MIR168a specifically targets mammalian LDLRAP1: evidence of cross-kingdom regulation by microRNA. Cell Res. 22, 107–126.

Zhou, J., Ma, C., Xu, H., Yuan, K., Lu, X., Zhu, Z., Wu, Y., Xu, G., 2009. Metabolic profiling of transgenic rice with crylAc and sck genes: an evaluation of unintended effects at metabolic level by using GC-FID and GC-MS. J. Chromatogr. B. Analyt. Technol. Biomed. Life Sci. 877, 725–732.

Zolla, L., Rinalducci, S., Antonioli, P., Righetti, P.G., 2008. Proteomics as a complementary tool for identifying unintended side effects occurring in transgenic maize seeds as a result of genetic modifications. J. Proteome Res. 7, 1850–1861.

Please cite this article in press as: Séralini, G.-E., et al. Long term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize. Food Chem. Toxicol. (2012), http://dx.doi.org/10.1016/j.fct.2012.08.005