Benjamin M. Lopatin, Esq.
California Bar No.: 281730
*lopatin@hwrlawoffice.com*
**THE LAW OFFICES OF**
**HOWARD W. RUBINSTEIN, P.A.**
One Embarcadero Center, Suite 500
San Francisco, CA 94111
(800) 436-6437
(415) 692-6607 (fax)

Michael Robert Reese, Esq.
California Bar No.:  206773
*mreese@reeserichman.com*
**REESE RICHMAN LLP**
875 Avenue of the Americas, 18th Floor
New York, NY 10001
(212) 643-0500
(212) 253-4272 (fax)

(Additional Counsel appear on signature page)

Attorneys for Plaintiff Gabriel Rojas
and the Proposed Class

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| **GABRIEL ROJAS,** as an individual, and on behalf of all others similarly situated, | Civil No.: **C 12-5099-WHO** |
| | Judge:  The Hon. William H. Orrick |
| *Plaintiff,* | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| *vs.* | |
| | Complaint filed: October 1, 2012 |
| **GENERAL MILLS, INC.,** | |
| | *Jury Trial Requested* |
| *Defendant.* | *California Class Representation* |

1   Plaintiff, GABRIEL ROJAS, individually, and on behalf of all others similarly situated,

2   by and through his undersigned counsel, and pursuant to this Court's *Order Granting in Part and*

3   *Denying in Part Motion to Dismiss*, dated October 9, 2013 (Dkt. 49), hereby files this Second

4   Amended Class Action Complaint, and alleges against Defendant, GENERAL MILLS, INC.

5   (collectively referred to herein as "GENERAL MILLS" or "Defendant"), as follows:

6   ## I. <u>INTRODUCTION</u>

7   1.   At all material times hereto, Defendant has unlawfully, fraudulently, unfairly,

8   misleadingly, and/or deceptively represented that the following twenty-nine (29) varieties of

9   Nature Valley® snack bars were "100% Natural":

10   1) Crunchy Granola Bars: Oats 'n Honey;

11   2) Crunchy Granola Bars: Peanut Butter;

12   3) Crunchy Granola Bars: Roasted Almond;

13   4) Crunchy Granola Bars: Apple Crisp;

14   5) Crunchy Granola Bars: Cinnamon;

15   6) Crunchy Granola Bars: Maple Brown Sugar;

16   7) Crunchy Granola Bars: Pecan Crunch;

17   8) Crunchy Granola Bars: Oats 'n Dark Chocolate;

18   9) Crunchy Granola Bars: Dark Chocolate Peanut Butter;

19   10) Sweet & Salty Nut Granola Bars: Almond;

20   11) Sweet & Salty Nut Granola Bars: Peanut;

21   12) Sweet & Salty Nut Granola Bars: Cashew;

22   13) Sweet & Salty Nut Granola Bars: Roasted Mixed Nut;

23   14) Sweet & Salty Nut Granola Bars: Dark Chocolate, Peanut & Almond;

24   15) Protein Chewy Bars: Peanut Butter Dark Chocolate;

25   16) Protein Chewy Bars: Peanut, Almond & Dark Chocolate;

26   17) Granola Thins Crispy Squares: Dark Chocolate;

27   18) Granola Thins Crispy Squares: Peanut Butter;

28

19) Granola Thins Crispy Squares: Dark Chocolate Peanut Butter;

20) Chewy Trail Mix Bars: Fruit & Nut;

21) Chewy Trail Mix Bars: Cranberry & Pomegranate;

22) Chewy Trail Mix Bars: Dark Chocolate & Nut;

23) Chewy Trail Mix Bars: Mixed Berry

24) Chewy Yogurt Granola Bars: Vanilla;

25) Chewy Yogurt Granola Bars: Strawberry;

26) Crunchy Granola Bars Variety Pack (Cinnamon / Oats 'n Honey / Peanut Butter);

27) Chewy Trail Mix Bars Variety Pack (Dark Chocolate & Nut / Fruit & Nut);

28) Chewy Trail Mix Bars Variety Pack (Apple Cinnamon / Fruit & Nut / Mixed Berry); and

29) Chewy Yogurt Variety Pack (Strawberry / Vanilla) (collectively, "the Products").

2.      The Products are not "natural," and certainly not "100% Natural," because they contain Genetically Modified Organisms ("GMOs") and other synthetic ingredients.

3.      Subsequent to the filing of this action, and as a catalyst thereof, Defendant has removed the "100% Natural" claim from the labeling for the Products.

4.      At all material times hereto, Defendant manufactured, marketed, advertised, and sold the Products, including the two flavors purchased by Plaintiff, Gabriel Rojas, Nature Valley® Oats and Honey Crunchy Granola Bars and Nature Valley® Dark Chocolate Peanut Butter Crunchy Granola Bars, as being 100% Natural, including, on the front packaging of the Products.[1]

5.      At all material times hereto, the Products made the exact same "100 Natural" claim in the exact same location for every flavor variety of the Products.

6.      For example, Defendant prominently places the representation "100% NATURAL" on the front of its Products.  *See* **Exhibit 1**.

7.      Defendant also places the "100% NATURAL" or "all natural" representations on

---

1.      *See* **Exhibit 1**, attached hereto and incorporated herein, true and correct copies of the labels of the twenty-nine (29) Products at issue.  (**Exhibit 1** also includes copies of the Product labeling attached to Plaintiff's First Amended Complaint as Exhibits 1 and 2 thereto.)

the back, top, and/or bottom of the Product boxes and/or on the wrappers that contain each individual granola bar.

8.     Further, Defendant makes representations on the back of the boxes such as the following:  "Since 1975, Nature Valley has been making great tasting crunchy granola bars with 100% natural ingredients like whole grain oats & honey."

9.     The representation that the Products are "100% Natural" is central to the marketing of the Products and is displayed prominently on their packaging.  The misrepresentations were uniform and were communicated to Plaintiff and every other member of the Class at every point of purchase and consumption.

10.     Unfortunately for consumers, the Products are not "100% natural."  For one, the Products are derived from unnatural, genetically modified plants (a/k/a genetically modified organisms or "GMOs").

11.     Furthermore, the "100% Natural" claim is false, misleading, and likely to deceive reasonable consumers in the same respect—that being due to their unnaturalness for containing GMOs and other synthetic ingredients.

12.     Contrary to Defendant's representations, the Products, at all material times hereto, are not "100% Natural," because the Products containing GMOs and other synthetic ingredients, such as Maltodextrin, Soy, Yellow Corn Flour, Soy Flour and/or Soy Lecithin.  Corn and soy are known to be derived from GMOs and/or being synthetically produced.

13.     The Products are simply not "100% Natural," therefore rendering Defendant's uniform claim unlawful, fraudulent, unfair, deceptive, and/or likely to mislead the public as a result.

14.     As a result, Plaintiff brings this class action to secure, among other things, equitable relief, declaratory relief, restitution, and in the alternative damages, for a Class of similarly situated California purchasers, against GENERAL MILLS, for (1) unlawful business practices in violation of Bus. & Prof. Code §§ 17200 *et seq.* ("UCL"); (2) fraudulent business practices in violation of Bus. & Prof. Code §§ 17200 *et seq.* ("UCL"), 3) unfair business practices

competition in violation of Bus. & Prof. Code §§ 17200 *et seq.* ("UCL"); (4) violation of California's False Advertising Law ("FAL"), Bus. & Prof. Code §§ 17500 *et seq.*; and (5) Violations of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq.*

15.     Plaintiff is seeking damages on behalf of the Class, in addition to an order requiring Defendant to cease using genetically modified organisms in its 100% Natural products, and/or stopping Defendant from representing its products are 100% Natural when they are not.

16.     Absent a Court Order, Defendant is capable of re-labeling the Products that contain GMOs and other synthetic ingredients as "100% Natural."

17.     Plaintiff expressly does not seek to contest or enforce any state law that has requirements beyond those stated in Federal laws or Regulations.

18.     Plaintiff expressly does not request that Defendant be required to label the Products with a GMO disclosure; rather, Plaintiff specifically requests that Defendant: 1) cease advertising or stating the Products as 100% Natural on the front packaging for the Products; and 2) that it informs consumers that the Products contain GMOs and other synthetic ingredients in advertising for the Products explicitly not related to the labeling for the Products.

19.     All allegations herein are based on information and belief and/or are likely to have evidentiary support after reasonable opportunity for further investigation and discovery.

## II. JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter presented by this Second Amended Class Action Complaint because it is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005), which explicitly provides for the original jurisdiction of the Federal Courts of any class action in which any member of the plaintiff class is a citizen of a state different from any Defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000.00, exclusive of interest and costs. Pursuant to 28 U.S.C. § 1332(d)(2)(A), Plaintiff alleges that the total claims of the individual members of the Plaintiff Class in this action are in excess of $5,000,000.00, in the aggregate,

1   exclusive of interest and costs, and as set forth below, diversity of citizenship exists under CAFA

2   because Plaintiff is a citizen of California, and GENERAL MILLS can be considered a citizen of

3   Delaware.

4       21.     Venue in this judicial district is proper pursuant to 28 U.S.C. §1391(a) because, as

5   set forth below, Defendant conducts business in, and may be found in, this district, and Plaintiff

6   purchased the subject Products of this action in this judicial district. The **"Declaration of Benjamin**

7   M. Lopatin, Esq., Pursuant to Civil Code §1780(c) of the Consumer Legal Remedies Act, Civil

8   Code §§1750 et seq." regarding venue under the California Consumer Legal Remedies Act

9   ("CLRA") was submitted with the original Complaint on October 1, 2012 [DE 2] and is fully

10  incorporated herein by reference.

## III. PARTIES

12      22.     Plaintiff is an individual more than 18 years old, and is a citizen of California, who

13  resides in the city and County of San Francisco. He respectfully requests a jury trial on damage

14  claims. Plaintiff has purchased the Products during the Class Period as described below.

15      23.     Defendant General Mills Company ("General Mills") is a Delaware licensed

16  corporation with its principal place of business located in the State of Minnesota at One General

17  Mills Blvd., Minneapolis, Minnesota 55426.  General Mills lists with the Minnesota Secretary of

18  State a Registered Agent designated as National Registered Agents, Inc., 1209 Orange Street,

19  Wilmington, Delaware 19801.  Therefore, General Mills can be considered a "citizen" of the State

20  of Minnesota.  Defendant General Mills also promoted and marketed the Products at issue in this

21  jurisdiction and in this judicial district.

22      24.     The advertising for the Products relied upon by Plaintiff was prepared and/or

23  approved by GENERAL MILLS and its agents, and was disseminated by GENERAL MILLS and

24  its agents through advertising containing the misrepresentations alleged herein. The advertising

25  for the Products was designed to encourage consumers to purchase the Products and reasonably

26  misled the reasonable consumer, i.e. Plaintiff and the Class into purchasing the Products.

27  GENERAL MILLS is the owner, manufacturer and distributor of the Products, and is the company

28

that created and/or authorized the unlawful, fraudulent, unfair, misleading and/or deceptive advertising and statements for the Products.

25.     Plaintiff alleges that, at all times relevant herein, GENERAL MILLS and its subsidiaries, affiliates, and other related entities, as well as their respective employees, were the agents, servants and employees of GENERAL MILLS, and at all times relevant herein, each was acting within the purpose and scope of that agency and employment. Plaintiff further alleges on information and belief that at all times relevant herein, the distributors and retailers who delivered and sold the Products, as well as their respective employees, also were GENERAL MILLS's agents, servants and employees, and at all times herein, each was acting within the purpose and scope of that agency and employment.

26.     In addition, Plaintiff alleges that, in committing the wrongful acts alleged herein, GENERAL MILLS, in concert with its subsidiaries, affiliates, and/or other related entities and their respective employees, planned, participated in and furthered a common scheme to induce members of the public to purchase the Products by means of untrue, misleading, deceptive, and/or fraudulent representations, and that GENERAL MILLS participated in the making of such representations in that it disseminated those misrepresentations and/or caused them to be disseminated.  Whenever reference in this Complaint is made to any act by GENERAL MILLS or its subsidiaries, affiliates, distributors, retailers and other related entities, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents, and/or representatives of GENERAL MILLS committed, knew of, performed, authorized, ratified and/or directed that act or transaction on behalf of GENERAL MILLS while actively engaged in the scope of their duties.

## IV. FACTUAL ALLEGATIONS

### A.  General Mills' Advertising of the 100% Natural Products

27.     GENERAL MILLS manufactures, distributes, markets, advertises, and sells the Products named in paragraph one (1) above, which claim to be "100% Natural," when in fact, they are not, because they contain GMOs and other synthetic ingredients, in the form of corn

and/or soy in the Products, such as Maltodextrin, Soy, Yellow Corn Flour, Soy Flour, and/or Soy Lecithin.

28.     Defendant's "100% Natural" statement prominently displayed on the front of the box for the Products' and on the front of each individual packaging for the Products is untrue, misleading, and likely to deceive reasonable consumers, such as Plaintiff and members of the Class, because the Products are not 100% Natural due to the presence of GMOs and other synthetic ingredients in the Products.

29.     Defendant unlawfully markets, advertises, sells and distributes the Products to California purchasers in California grocery stores, food chains, mass discounters, mass merchandisers, club stores, convenience stores, drug stores and/or dollar stores, as being "100% Natural."

30.     All of the Products' packaging uniformly and consistently states that the Products are 100% Natural on the front of the box for each of the Products and on the front of each individual packaging for the Products that come inside each box.

31.     As a result, all consumers within the Class, including Plaintiff, who purchased the Products were exposed to the same "100% Natural" claim in the same location on the front box and individual packaging for the Products.

32.     Unfortunately for consumers, they were charged a price premium for these alleged 100% Natural Products over Products that did not claim to be "100% Natural."

33.     Defendant's 100% Natural representations convey a series of express and implied claims which Defendant knows are material to the reasonable consumer, and which Defendant intends for consumers to rely upon when choosing to purchase the Products.

**B.  GMOs Are Not Natural**

34.     GMOs are not "natural" and certainly not "100% Natural."  As more fully alleged below, "unnatural" is a defining characteristic of genetically modified foods and/or synthetic ingredients.

35.     GMOs are not natural because they grow from seeds that have been modified in a

laboratory.  GMOs are plants that grow from seeds in which DNA splicing has been used to place genes from another source into a plant.   Contrary to Defendant's express or implied representations, the Products use plants or plant derivatives grown or created from GMOs, and are thus not "100% Natural."

36.     The term GM foods or GMOs (genetically-modified organisms) commonly refers to crop plants created for human or animal consumption using the latest molecular biology techniques.

37.     The "FDA has not developed a definition for use of the term natural or its derivatives," but it has *loosely* defined the term "natural" as a product that "does not contain added color, artificial flavors, or synthetic substances."[2] According to federal regulations, an ingredient is synthetic if it is:

> [a] substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources, except that such term shall not apply to substances created by naturally occurring biological processes.

7 C.F.R. §205.2.

38.     Therefore, the FDA has not occupied the field of Natural or GMO labeling, and in any event, this case is not about labeling, it is about advertising statements that are not related to the labeling of the Products, including, but not limited to, the "100% Natural" statement on the front box and packaging for the Products.  Likewise, Courts routinely decide whether "natural" statements are likely to deceive reasonable consumers for pleading standards.

39.     Similarly, the USDA's Food Safety and Inspection Service ("FSIS") defines a "natural" product as a product that does not contain any artificial or synthetic ingredient and does not contain any ingredient that is more than "minimally processed," defined as:

---

2.     *What is the Meaning of 'Natural' on the Label of Food?*, FDA, Transparency, FDA Basics. available at *http://www.fda.gov/AboutFDA/Transparency/Basics/ucm214868* (last visited Oct. 23, 2013).

(a) those traditional processes used to make food edible or to preserve it or to make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting, or (b) those physical processes which do not fundamentally alter the raw product and/or which only separate a whole, intact food into component parts, e.g., grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices.

Relatively severe processes, e.g., solvent extraction, acid hydrolysis, and chemical bleaching would clearly be considered more than minimal processing.[3]

40. The scientific description of how GMOs are produced refutes any attempt to categorize them as 'minimally processed,' "100% Natural" or substantially similar to something naturally occurring. Contemporary research on GMOs has made clear that genetic engineering is completely different from natural breeding and entails different risks because the genetic engineering and associated tissue culture processes are imprecise and highly mutagenic, leading to unpredictable changes in the DNA, proteins, and biochemical composition of the resulting GMO that can lead to unexpected toxic or allergenic effects and nutritional disturbances:

[T]he process of inserting a genetically modified gene into the DNA of a plant cell is crude, uncontrolled, and imprecise, and causes mutations – heritable changes – in the plant's DNA blueprint. These mutations can alter the functioning of the natural genes of the plant in unpredictable and potentially harmful ways.

Because of these diverse interactions, and because even the simplest organism is extremely complex, it is impossible to predict the impacts of even a single GM gene on the organism. It is even more impossible to predict the impact of the GMO on its environment – the complexity of living systems is too great. In short, unintended, uncontrolled mutations occur during the GM process and complex interactions occur at multiple levels within the organism as a result of the insertion of even a single new gene. For these reasons, a seemingly simple genetic modification can give rise to many unexpected changes in the resulting crop and the foods

---

3. *Food Standards and Labeling Policy Book*, USDA, 2005, available at *http://www.fsis.usda.gov/oppde/larc/policies/labeling_policy_book_082005.pdf* (last visited Oct. 23, 2013).

produced from it. The unintended changes could include alterations in the nutritional content of the food, toxic and allergenic effects, poor crop performance, and generation of characteristics that harm the environment.[4]

41.     As of January 2010, Monsanto was the world's dominant producer of genetically modified seeds; 80% of the U.S. corn crop is grown with seeds containing Monsanto's technology.[5]  Monsanto defines GMOs as "Plants or animals that *have had their genetic makeup altered to exhibit traits that are not naturally theirs*.  In general, genes are taken (copied) from one organism that shows a desired trait and transferred into the genetic code of another organism."[6]

42.     Romer Labs, a company that provides diagnostic solutions to the agricultural industry, defines GMOs as "[a]griculturally important plants [that] are often genetically modified by the insertion of DNA material from outside the organism into the plant's DNA sequence, allowing the plant to *express novel traits that normally would not appear in nature*, such as herbicide or insect resistance.  Seed harvested from genetically modified plants will also contain these modifications."[7]

43.     The unnaturalness of GMOs is further evidenced by the explanations of health and environmental organizations, such as The World Health Organization, which defines GMOs as

---

4.     Michael Antoniou, *et al.*, *GMO Myths and Truths: An evidence-based examination of the claims made for the safety and efficacy of genetically modified crops*, Earth Open Source, June 2012, p. 11, available at *http://earthopensource.org/files/pdfs/GMO_Myths_and_Truths/GMO_Myths_and_Truths_1.3.pdf* (last visited Oct. 23, 2013).

5.     Robert Langreth and Bruce Herper, The Planet Versus Monsanto, Forbes, Jan. 18, 2010, http://www.forbes.com/forbes/2010/0118/americas-best-company-10-gmos-dupont-planet-versus-monsanto.html (last visited Oct. 23, 2013).

6.     Monsanto Glossary, http://www.monsanto.com/newsviews/Pages/glossary.aspx#g  (last visited Oct. 18, 2013) (emphasis added).

7.     Romer Labs, http://www.romerlabs.com/en/knowledge/gmo/ (last visited Oct. 18, 2013) (emphasis added).

"organisms in which the genetic material (DNA) **has been altered in a way that does not occur naturally**."[8]

44.     Genetic engineering is not just an extension of conventional breeding.  In fact, it differs profoundly.  "As a general rule, conventional breeding develops new plant varieties by the process of selection, and seeks to achieve expression of genetic material which is already present within a species…. Conventional breeding employs processes that occur in nature, such as sexual and asexual reproduction….Genetic engineering works primarily through insertion of genetic material, although gene insertion must also be followed up by selection. This insertion process does not occur in nature."[9]

45.     To this day, no scientific studies have guaranteed that GMOs are safe for human consumption in the long-term. In fact, many indicate the contrary. More than one hundred peer-review studies have shown that GMOs damage the vital organs, immune systems and reproductive functions of animals.  Conscientious consumers have been particularly alarmed by the use of gene splicing to incorporate a bacterial toxin in plants that can repel pests.[10]  Canadian researchers reported that the blood of ninety-three percent of pregnant women and eighty percent of their umbilical cord blood samples contained a pesticide implanted in GMO corn by the biotech company Monsanto, though manufacturers of GMOs claim that digestion is supposed to remove it from the body. "Given the potential toxicity of these environmental pollutants and the fragility

---

8.     World Health Organization, 20 Questions on Genetically Modified (GM) Foods at http://www.who.int/foodsafety/publications/biotech/en/20questions_en.pdf (last visited Oct. 23, 2013).

9.     Michael K. Hansen, Genetic Engineering Is Not An Extension Of Conventional Plant Breeding; How genetic engineering differs from conventional breeding, hybridization, wide crosses and horizontal gene transfer, http://consumersunion.org/wp-content/uploads/2013/02/Wide-Crosses.pdf (last visited Oct. 23, 2013).

10.     Eng, Monica. "Altered food labeling sought \ Prevalence of genetically modified fare sparks protests." Chicago Tribune. May 25, 2011.

of the fetus, more studies are needed," they wrote in Reproductive Toxicology.[11]   Other concerns that have been raised by environmental groups include the possibility that GMOs contribute to the spread of antibiotic resistance, and could introduce new allergens into foods.[12]   Concern surrounding the latter topic of allergens relates to two factors; the possibility that genes from known allergens may be inserted into crops not typically associated with allergenicity and the possibility of creating new, unknown allergens by either inserting novel genes into crops or changing the expression of endogenous proteins.[13] A person allergic to Brazil nuts, for example only, would be at risk of suffering an allergic reaction from consuming a product that contained a GMO bioengineered to contain DNA from Brazil nuts.  The consumer would be unaware of the potential allergic reaction because the product containing the GMO would in no way warn of or even indicate its genetically modified condition.

46.     While the Food and Drug Administration (FDA) has not formally defined the term "natural" due to alleged deference to the judicial system, it has allowed the sale and planting of genetically modified foods for 15 years. The FDA wrote in a statement to the Tribune that "[u]ltimately, it is the food producer who is responsible for assuring safety," noting also that manufacturers are encouraged to consult with the agency about their products.[14] On the contrary, the European Union has recognized the potential dangers inherent in consuming genetically modified organisms and has some of the most stringent GMO regulations in the world.  In the

---

11.     Eng, Monica. "Altered food labeling sought \ Prevalence of genetically modified fare sparks protests." Chicago Tribune. May 25, 2011.  See also  Goldberg, Max. "For the First Time Ever, Monsanto will be Marketing its Products Directly to Consumers with Sweet Corn-Serious Implications." New York Times, 12 August 2011.

12.     Bakshi A (2003). "Potential adverse health effects of genetically modified crops". J Toxicol Environ Health B Crit Rev 6 (3): 211–25.

13.     Key S, Ma JK, Drake PM (June 2008). "Genetically modified plants and human health". J R Soc Med 101 (6): 290–8.

14.     Eng, Monica. "Altered food labeling sought \ Prevalence of genetically modified fare sparks protests." Chicago Tribune. May 25, 2011.

European Union all GMOs are considered "new food" and subject to extensive, case-by-case, science based food evaluation by the European Food Safety Authority (EFSA). The EFSA reports to the European Commission who then draft a proposal which if accepted will be adopted by the EC or passed on to the Council of Agricultural Ministers. [15] There is also a safeguard clause that Member States can invoke to restrict or prohibit the use and/or sale of a GMO within their territory if they have a justifiable reason to consider that the approved GMO constitutes a risk to human health or the environment.[16]  By 2010, the only GMO food crop with approval for cultivation in Europe is the GM maize MON810, and a second GMO, a potato called Amflora, was approved for cultivation for industrial applications in the EU by the European Commission.[17]  Despite the European Union's approval of MON 810, however, it has been banned for cultivation by Germany, Austria, France, Greece, Luxembourg, Poland and Bulgaria.  Meanwhile, Italy does not allow for the cultivation of GMOs.[18]

47.    In addition, independent scientific testing of the effects of GMOs on rats, hamsters, and mice have generated great concern as to the safety of GMOs. The tests have been conducted by: Dr. Irina Ermakova, the Institute of High Neural Activity and Neurophysiology of Russian Academy of Sciences, Moscow; Dr. Alexey Surov and Dr. Alexander Baranov, the Institute of Environmental and Evolution Problems and the Institute of Developmental Biology, Moscow); and Dr. Maria Konovalova, the Saratov Agrarian University. All three of these studies

---

15.    Davison, J. (February 2010). "GM plants: Science, politics and EC regulations". Plant Science 178 (2): 94–98.

16.    European Commission. "Food Safety: From the farm to the fork (What are the National safeguard measures)" Europa.eu, http://ec.europa.eu/food/index_en.htm (last visited Oct. 18, 2013).

17.    European Commission approves Amflora starch potato, BASF - The Chemical Company - Corporate Website, http://www.basf.com/group/pressrelease/P-10-179 (last visited Oct. 18, 2013).

18.    Barker, Debbie. "The GMO Emperor has No Clothes," p. 37, http://www.navdanya.org/attachments/Latest_Publications7.pdf (last visited Oct. 18, 2013).

demonstrate significant biological and behavioral changes in the animals when GM soy or GM corn was put into their feed. Some of the biological effects include increased mortality among newborns in the first generation, reduced quantity of offspring, and spike in sterility among second generation animals. On the behavioral front, animals became more aggressive and lost maternal instincts.[19]

48.     Another study conducted by Dr. Arpad Pusztai the potential health risks that GMOs pose to internal organs.  Dr. Arpad Pusztai's research has shown that rats fed with GE potatoes had enlarged pancreases, their brains had shrunk, and their immunity had been damaged. Dr. Eric Seralini's research demonstrated that organ damage can occur.  In addition, the Committee of Independent Research and Information on Genetic Engineering (CRIIGEN) and universities at Caen and Rouen were able to get raw data of Monsanto's 2002 feeding trials on rats at the European Council order and made it public in 2005. The researchers found that rats fed with three approved corn varieties of GE corn—Mon 863, insecticide products, Mon 810, and Roundup Ready herbicide —suffered organ damage. The data "clearly underlines adverse impacts on kidneys and liver, the dietary, detoxifying organs as well as different levels of damages to the heart, adrenal glands, spleen and hematopoietic systems," according to Dr. Gilles Eric Seralini, a molecular biologist at the University of Caen.[20]

49.     Additionally, evidence of liver and kidney toxicity appeared when rats were fed an approved GE maize variety (Mon 863) (Seralini GE, Cellier D. & Spironx de Vendomois, J, 2007, "New analysis of rat feeding study with a GM Maize", Archives of Environmental Contamination and Toxicology, 10,1007, S 00244-006-0149-5). Similar effects were observed when Monsanto fed its GT-73 Roundup Ready canola variety to rats. The rats showed a 12 percent to 16 percent increase in liver weight.[21]

---

19.     *Id.* at 39.
20.     *Id.* at 17.  *See also* "A Comparison of the Effects of Three GM Corn Varieties on Mammalian Health," Joel Spiroux de Veu de Mois, Francois Roullier, Dominique Cellise, Gilles Eric Serelini, International Journal of Biological Sciences, 2009, 5: 706-726.

21.     *See supra* note 18, at 18. *See also* Greenpeace (2004) "Greenpeace critique of Monsanto's

50.   Even the World Health Organization (WHO) cautions that "Different GM organisms include different genes inserted in different ways. This means that individual GM foods and their safety should be assessed on a case-by-case basis and that it is not possible to make general statements on the safety of all GM foods."[22]   More recently, Americans have also expressed a heightened concern about the safety of GMO products, as evinced by the fact that numerous states have currently introduced legislation on GMO labeling.  In addition,  polls taken by the Pew Center, Consumers Union, Harris Interactive and ABC over the last decade that have consistently found that the vast majority of Americans would like to see genetically modified foods better regulated and labeled.[23]

51.   At a minimum, Plaintiff contends that Defendant should be ordered to cease labeling the Products "100% natural."

52.   Most people consider the decision of what they put into their bodies to be tremendously important.  People follow restricted diets for religious reasons (some observers of the Jewish faith keep Kosher, some observers of Muslim faith only eat Halal food, and some observers of Hindu faith refuse beef), for moral or personal reasons (many vegetarians and vegans restrict their diets for moral reasons), or because they physically cannot eat certain foods (those with celiac disease cannot eat wheat, those who are lactose intolerant cannot consume dairy products, and those with other food allergies face similar restrictions). In the latter scenario, eating the food in question could cause severe physical harm or death. In the first two scenarios, while the diets may be driven by personal choice rather than physical necessity, the beliefs behind the

---

Roundup            Ready            Oilseed            rape,            GT-73," http://www.greenpeace.at/uploads/media/GT73_Greenpeace_comments_Oct_2004_01.pdf  (last visited Oct. 18, 2013).

22.   *See supra* note 18 at 19; *see also supra* note 8.

23.   Eng, Monica. "Debate rages over labeling biotech foods; Industry resists listing genetically modified ingredients; consumer worries continue." L.A. Times.   June 2, 2011. BUSINESS; Business Desk; Part B; p. 4.

choices are often deeply held. If a Muslim eats soup that is labeled vegetarian but in fact contains pork, or if a vegetarian eats cereal that contains mouse parts, the mislabeling that led to the inadvertent consumption is likely to be extremely offensive.[24]

53.   Likewise, Defendant's covert inclusion of GMOs in its Products, amounts to an unlawful affront to the health conscious consumers and the public at large.  As Wendell Berry Notes in her *Twelve Paragraphs on Biotechnology*, "[i]n biotechnology, as in any technology affecting living systems, there is nothing perfectly predictable. What we do within living bodies and in the living world is never a simple mechanical procedure such as threading a needle or winding a watch. Mystery exists; unforeseen and unforeseeable consequences are common."[25] Accordingly, Defendant's "100% natural" claim masks the existence of GMOs in the Products, and thus violates the consumer's right to know what is being introduced into his or her body/internal system, and right to choose whether he or she wishes to participate in the current experimental stage of genetically modified organisms and their comprehensive effect on human health.

54.   As indicated by the definitions and descriptions above, which come from a wide array of industry, government and health organizations, GMOs are not "100% natural" and do not naturally occur.  GMOs are "created" artificially in a laboratory through genetic engineering. Thus, by claiming the Products are "100% natural" Defendant deceive and mislead reasonable consumers.

### C.  Reasonable Consumers Have Concern Over GMOs

55.   There is an increasing concern amongst health experts and consumers alike that introducing foreign genes into food plants may have unexpected and negative impacts on human health, such as creating new allergens, causing allergic reactions in susceptible individuals, and causing digestive issues.

---

24.   Valery Federici. "Genetically Modified Food and Informed Consumer Choice: Comparing U.S. and E.U. Labeling Laws."  35 Brooklyn J. Int'l L. 51 5 at 528.

25.   *See supra* note 18, at 43.

56.     Generally, the concerns about GMOs fall into three categories: environmental hazards, human health risks and economic concerns. Some concerns for human health risks associated with GMOs include, but are not limited to, the possibility that introducing a new gene into a plant may create a new allergen, cause an allergic reaction in susceptible individuals or have an unexpected and negative impact on overall human health.

57.     Polls taken by the Pew Center, Consumers Union, Harris Interactive, the Huffington Post and ABC over the last decade that have consistently found that the vast majority of Americans would like to see genetically modified foods better regulated and labeled.[26]

58.     Legislation requiring the labeling of GMOs has been proposed in more than a dozen states since 2011.[27]   During California's November 2012 election, the passage of Proposition 37 would have prohibited retailers and food companies from labeling or advertising of food as "natural" if made from GMOs. Although Proposition 37 did not pass, 47.2% of California voters voted "yes" and this continues to be an important consideration for California consumers when purchasing food products.[28]

59.     Indeed, whether a packaged food item labeled "100% Natural" contains genetically modified and/or synthetic ingredients is a material question to a reasonable consumer.

### D.  Defendant's Products Contain GMOs & Other Synthetic and Highly Processed Ingredients

60.     The Products contain unnatural ingredients, such as corn in for the form of

---

26.     Eng, Monica. "Debate rages over labeling biotech foods; Industry resists listing genetically modified ingredients; consumer worries continue." L.A. Times.   June 2, 2011. BUSINESS; Business Desk; Part B; p. 4.

27.     See Harmon & Pollack, Battle Brewing Over Labeling of Genetically Modified Food, N.Y. Times, Science, May 24, 2012, http://www.nytimes.com/2012/05/25/science/dispute-over-labeling-of-genetically-modified-food.html?_r=0 (last visited Oct. 23, 2013).
28.     California Election Results, L.A. Times, Nov. 6, 2012, http://graphics.latimes.com/2012-election-results-california/ (last visited Oct. 23, 2013).

GMOs/synthetic ingredients, thereby causing the Products to fail to be "natural," and certainly not "100% natural."[29]

61.     As detailed below, a reasonable consumer might interpret the names of some of the ingredients as "natural," even though the ingredients are, in fact, highly-processed, synthetic, or derived from GMOs—and thus unnatural.

62.     *Corn* ingredients, are heavily processed or derived from GMOs.[30] Corn products are often further refined through unnatural processes, using chemical additives, acid washes, and alkaline solutions.[31]

63.     *Soy* ingredients are heavily processed or derived from GMOs.[32]  Soy products are often further refined through unnatural processes, using chemical additives, acid washes, and alkaline solutions.[33]

64.     *Maltodextrin* is a saccharide polymer that is produced through partial acid and enzymatic hydrolysis of corn starch.[34]  The acid hydrolysis process is specifically deemed to be a relatively severe process that renders an ingredient no longer "natural."[35]

_____

29.    See Invisible GM Ingredients, Non-GMO Shopping Guide, http://www.nongmoshoppingguide.com/brands/invisible-gm-ingredients.html (last visited Oct. 23, 2013).

30.    Maize (corn), GMO Compass, http://www.gmo-compass.org/eng/database/plants/52.maize.html (last visited Oct. 23, 2013).

31.    *Id.*

32.    Soy is Everywhere, GMO Compass, http://www.gmo-compass.org/eng/grocery_shopping/ingredients_additives/34.ingredients_additives_soybeans.html (last visited Oct. 23, 2013).

33.    *Id.*

34.    Maltodextrins, GMO Compass, http://www.gmo-compass.org/eng/database/ingredients/148.maltodextrins.html (last visited Oct. 23, 2013).

35.    *See id.*

65.     Despite all these unnatural ingredients, Defendant knowingly markets the Products as "100% natural."

**E.   Defendant Deceptively Markets the Products as "100% Natural" to Induce Consumers to Purchase the Products**

66.     A representation that a product is "100% natural" and/or "Natural" is material to a reasonable consumer.  According to Consumers Union, "Eighty-six percent of consumers expect a 'natural' label to mean processed foods do not contain any artificial ingredients."[36]

67.     Defendant markets and advertises the Products as "100% natural" to increase sales of the Products and Defendant is well-aware that claims of food being "100% natural" are material to consumers.  Despite knowing that GMOs are not natural and that its Products contain GMOs and other unnatural, highly processed substances, Defendant has engaged in a widespread marketing and advertising campaign to portray the Products as being "100% natural."

68.     Defendant engaged in this misleading and deceptive campaign to charge a premium for the Products and take away market share from other similar products.  As stated herein, such representations and the widespread marketing campaign portraying the Products as being "100% natural" are misleading and likely to deceive reasonable consumers because the Products are not "100% natural" due to being made with unnatural ingredients.

**F.   Plaintiff's Purchase of the Products**

69.     Plaintiff has purchased the Products, including Nature Valley® Oats and Honey Crunchy Granola Bars and Nature Valley® Dark Chocolate Peanut Butter Crunchy Granola Bars, which contain corn and/or soy ingredients, during the Class Period, and specifically during 2012, from Safeway grocery stores, located at 350 Bay Street, San Francisco, California 94133, and 735 7th Avenue, San Francisco, California 94118.  At all material times hereto, the Products claimed

---

36.     Notice of the Federal Trade Commission, Comments of Consumers Union on Proposed Guides for Use of Environmental Marketing Claims, 16 CFR § 260, Dec. 10, 2010, http://www.ftc.gov/os/comments/greenguiderevisions/00289-57072.pdf (last visited Oct. 23, 2013)

to be "100% Natural" on the front box and front packaging for the individual Products within the box.  At the time of purchase, Plaintiff perceived, read and relied on the "100% Natural" statement on the front of the box for Nature Valley® Oats and Honey Crunchy Granola Bars and Nature Valley® Dark Chocolate Peanut Butter Crunchy Granola Bars, believing the material "100% Natural" statement to mean that the Products did not contain GMOs or other synthetic ingredients, such as corn.

70.     Defendant manufactures, markets, advertises, distributes and sells the Products claiming to be 100% Natural in retail stores, including Safeway stores, located throughout California, and in this judicial district.

71.     As a result, through a variety of advertising, including but not limited to the packaging of the Products, GENERAL MILLS has made untrue and misleading material statements and representations regarding the Products, which have been relied upon by Plaintiff and members of the Class.

### G.  Plaintiff's Reliance on Defendant's 100% Natural Statement

72.     Defendant's 100% Natural statement is displayed throughout the Products' advertising, including, but not limited to, the Products' box and packaging.

73.     Prior to his purchase, and in purchasing the Products, Plaintiff saw, read, and relied on the material 100% Natural statement displayed on the packaging for the Products.

74.     Plaintiff believed the representation that the Products were 100% Natural meant that the Products do not contain, nor were they made with, any genetically modified and/or bioengineered ingredients.

75.     Plaintiff and members of the Class would not have purchased the Products had they known that they were not 100% Natural.  Likewise, if Plaintiff and members of the Class had known the Products contained GMOs, they would not have purchased them.

76.     Defendant's 100% Natural statement related to the Products is material to a consumer's purchase decision because reasonable consumers, such as Plaintiff and members of the Class, care whether products contain genetically modified or bioengineered ingredients, and

1    thus attach importance to a 100% Natural claim when making a purchasing decision.

2        77.    Plaintiff relied upon the name "Nature Valley," representations such as "Natural

3    Energy Bar," the representation that the Products are "granola bars," and the green coloring and

4    "pastoral" images on the packaging, all of which convey qualities of healthfulness and naturalness

5    to a reasonable consumer.  Had Plaintiff known at the time that the Products were not, in fact,

6    "natural" but, instead, made with GMOs and other unnatural, synthetic ingredients, he would not

7    have purchased the Products or paid a premium for the Products.

8                    **H.  Plaintiff Has Suffered Economic Damages**

9        78.    Plaintiff and members of the Class have been economically damaged by their

10   purchase of the Products because the advertising for the Products was and is untrue and/or

11   misleading under California law; therefore, the Products are worth less than what Plaintiff and

12   members of the Class paid for them and/or Plaintiff and members of the Class did not receive

13   what they reasonably intended to receive.

14       79.    Plaintiff and the Class seek damages equal to the aggregate purchase price paid by

15   the Class for the Products during the Class Period because the Products are worthless due to not

16   being "100% Natural," due to the presence of GMOs and other synthetic ingredients.

17       80.    Moreover, Plaintiff paid a price premium for the 100% Natural Products, over

18   other similar products that do not claim to be 100% Natural.

19       81.    As a result, Plaintiff and members of the Class have suffered economic damages.

20       82.    Furthermore, reasonable consumers frequently rely on food label representations

21   and information in making purchase decisions.

22       83.    Here, Plaintiff and the other Class members reasonably relied to their detriment on

23   Defendant's misleading representations and omissions.  Defendant's misleading affirmative

24   statements about the "naturalness" of its Products obscured the material facts that Defendant

25   failed to disclose about the unnaturalness of its Products.

26       84.    Plaintiff and the other Class members were among the intended recipients of

27   Defendant's deceptive representations and omissions.

28

85.     Defendant made the deceptive representations and omissions on the Products with the intent to induce Plaintiff's and the other Class members' purchase of the Products.

86.     Defendant's deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

87.     Thus, Plaintiff's and the other Class members' reliance upon Defendant's misleading and deceptive representations and omissions may be presumed.

88.     The materiality of those representations and omissions also establishes causation between Defendant's conduct and the injuries sustained by Plaintiff and the Class.

89.     Defendant's false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled Plaintiff and the other Class members.

90.     In making the false, misleading, and deceptive representations and omissions, Defendant knew and intended that consumers would pay a premium for "100% natural" labeled products over comparable products that are not labeled "100% natural" furthering Defendant's private interest of increasing sales for its Products and decreasing the sales of products that are truthfully offered as "100% natural" by Defendant's competitors, or those that do not claim to be "100%natural."

91.     As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive representations and omissions, Defendant injured Plaintiff and the other Class members in that they:

    1)  paid a sum of money for Products that were not as represented;

    2)  paid a premium price for Products that were not as represented;

    3)  were deprived the benefit of the bargain because the Products they purchased were different than what Defendant warranted;

    4)  were deprived the benefit of the bargain because the Products they purchased had less value than what was represented by Defendant;

5) did not receive Products that measured up to their expectations as created by Defendant;

6) ingested a substance that was other than what was represented by Defendant;

7) ingested a substance that Plaintiff and the other members of the Class did not expect or consent to;

8) ingested a product that was artificial, synthetic, or otherwise unnatural;

9) ingested a substance that was of a lower quality than what Defendant promised;

10) were denied the benefit of knowing what they ingested;

11) were denied the benefit of truthful food labels;

12) were forced unwittingly to support an industry that contributes to environmental, ecological, and/or health damage;

13) were denied the benefit of supporting an industry that sells natural foods and contributes to environmental sustainability; and

14) were denied the benefit of the beneficial properties of the natural foods promised.

92.     Had Defendant not made the false, misleading, and deceptive representations and omissions, Plaintiff and the other Class members would not have been economically injured.

93.     Among other things, Plaintiff and the other Class members would not have been denied the benefit of the bargain.  They would not have ingested a substance that they did not expect or consent to.  They would not have been forced unwittingly to support an industry that contributes to environmental damage.

94.     Plaintiff and the other Class members would not have suffered the other injuries listed above.  Accordingly, Plaintiff and the other Class members have suffered injury in fact as a result of Defendant's wrongful conduct.  Plaintiff and the other Class members all paid money for the Products.  However, Plaintiff and the other Class members did not obtain the full value of the advertised Products due to Defendant's misrepresentations and omissions.  Plaintiff and the other Class members purchased, purchased more of, or paid more for, the Products than they

1    would have had they known the truth about the Products' unnaturalness.

2        95.    Accordingly, Plaintiff and the other Class members have suffered injury in fact

3    and lost money or property as a result of Defendant's wrongful conduct.

4                    **V. CLASS ACTION ALLEGATIONS**

5        96.    Plaintiff re-alleges and incorporates by reference the allegations set forth in each

6    of the preceding paragraphs of this Second Amended Class Action Complaint.

7        97.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this class action

8    and seeks certification of the claims and certain issues in this action on behalf of a Class defined

9    as:

10           **all California residents who have purchased for personal use**
11           **General Mills' Nature Valley Products—as defined in**
             **paragraph one (1) of this Second Amended Complaint—which**
12           **claimed to be "100% Natural" and contained corn or soy**
             **ingredients, during the period extending from October 1, 2008,**
13           **through and to the date Defendant ceased labeling the Products**
             **"100% Natural."**

14

15       98.    Plaintiff respectfully reserve the right to amend the Class definition if further

16   investigation and discovery indicates that the Class definition should be narrowed, expanded, or

17   otherwise modified.  Excluded from the Class are governmental entities, Defendant, any entity in

18   which Defendant has a controlling interest, and Defendant's officers, directors, affiliates, legal

19   representatives, employees, co-conspirators, successors, subsidiaries, and assigns.  Also excluded

20   from the Class is any judge, justice, or judicial officer presiding over this matter and the members

21   of their immediate families and judicial staff.

22       99.    Defendant's practices and omissions were applied uniformly to all members of the

23   Class, including any subclass, so that the questions of law and fact are common to all members of

24   the Class and any subclass.

25       100.   All members of the Class and any subclass were and are similarly affected by the

26   deceptive advertising for the Products, and the relief sought herein is for the benefit of Plaintiff

27   and members of the Class and any subclass.

28

101.    Based on the annual sales of the Products and the popularity of the Products, it is readily apparent that the number of consumers in both the Class and any subclass is so large as to make joinder impractical, if not impossible.

102.    Questions of law and fact common to the Plaintiff Class and any subclass exist that predominate over questions affecting only individual members, including, *inter alia*:

    a.    Whether Defendant's practices and representations related to the marketing, advertising and sales of the Products in California were unlawful in any respect, thereby violating Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

    b.    Whether Defendant's practices and representations related to the marketing, advertising and sales of the Products in California were fraudulent in any respect, thereby violating Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

    c.    Whether Defendant's practices and representations related to the marketing, advertising and sales of the Products in California were unfair in any respect, thereby violating Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

    d.    Whether Defendant's practices and representations related to the marketing, advertising and sales of the Products in California were untrue and/or misleading in any respect, thereby violating Cal. Bus. & Prof. Code §§ 17500 *et seq.*;

    e.    Whether Defendant violated Cal. Civ. Code §§ 1750 *et seq*. with its practices and representations related to the marketing, advertising, and sales of the Products within California;

    f.    Whether the Products are "100% Natural;"

    g.    Whether the ingredients contained in the Products are "100% Natural;"

    h.    Whether the claim "100% Natural" on the Products' packaging and advertising is material to a reasonable consumer;

    i.    Whether the claim "100% Natural" on the Products' packaging and advertising is false to a reasonable consumer.

    j.    Whether the claim "100% Natural" on the Products' packaging and advertising is

1    likely to deceive a reasonable consumer;

2    k.    Whether the claim "100% Natural" on the Products' packaging and advertising is

3          misleading to a reasonable consumer;

4    l.    Whether a reasonable consumer is likely to be deceived by a claim that a product

5          is "100% Natural" where the product contains or is made from genetically

6          modified ingredients or other synthetic ingredients; and,

7    m.    Whether Defendant's conduct as set forth above injured consumers and if so, the

8          extent of the injury.

9    103.   The claims asserted by Plaintiff in this action are typical of the claims of the

10   members of the Plaintiff Class and any subclass, as the claims arise from the same course of

11   conduct by Defendant, and the relief sought within the Class and any subclass is common to the

12   members of each.

13   104.   Plaintiff will fairly and adequately represent and protect the interests of the

14   members of the Plaintiff Class and any subclass.

15   105.    Plaintiff has retained counsel competent and experienced in both consumer

16   protection and class action litigation.

17   106.   Certification of this class action is appropriate under Federal Rule of Civil

18   Procedure 23 because the questions of law or fact common to the respective members of the Class

19   and any subclass predominate over questions of law or fact affecting only individual members.

20   This predominance makes class litigation superior to any other method available for a fair and

21   efficient decree of the claims.

22   107.   Absent a class action, it would be highly unlikely that the representative Plaintiff

23   or any other members of the Class or any subclass would be able to protect their own interests

24   because the cost of litigation through individual lawsuits might exceed expected recovery.

25   108.   Certification also is appropriate because Defendant acted, or refused to act, on

26   grounds generally applicable to both the Class and any subclass, thereby making appropriate the

27   relief sought on behalf of the Class and any subclass as respective wholes. Further, given the large

28

1    number of consumers of the Products, allowing individual actions to proceed in lieu of a class

2    action would run the risk of yielding inconsistent and conflicting adjudications.

3        109.    A class action is a fair and appropriate method for the adjudication of the

4    controversy, in that it will permit a large number of claims to be resolved in a single forum

5    simultaneously, efficiently, and without the unnecessary hardship that would result from the

6    prosecution of numerous individual actions and the duplication of discovery, effort, expense and

7    burden on the courts that individual actions would engender.

8        110.    The benefits of proceeding as a class action, including providing a method for

9    obtaining redress for claims that would not be practical to pursue individually, outweigh any

10   difficulties that might be argued with regard to the management of this class action.

11

12                    **VI. FIRST CAUSE OF ACTION:**
                **VIOLATIONS OF CAL. BUS & PROF. CODE §§ 17200 *ET SEQ*.**
13                   **(Unlawful Business Acts and/or Practices)**

14       111.    Plaintiff re-alleges and incorporates by reference the allegations set forth *supra* in

15   this Complaint.

16       112.    This cause of action is brought on behalf of Plaintiff and members of the general

17   public pursuant to Cal. Bus. & Prof. Code §§ 17200 *et seq*., which provides that "unfair

18   competition shall mean and include any unlawful . . . business act or practice and unfair, deceptive,

19   untrue or misleading advertising and any act prohibited by Chapter I (commencing with Section

20   17500) as Part 3 of Division 7 of the Business and Professions Code."

21       113.    Defendant has violated the unlawful prong of the UCL by engaging in business

22   acts and practices that offend public policies and are immoral, unethical, unscrupulous and

23   substantially injurious to consumers, such as Plaintiff and members of the Class.  Specifically,

24   Defendant has advertised that the Products are 100% Natural even though the Products contain

25   GMOs and other synthetic ingredients.  Plaintiff contends that Defendant should cease advertising

26   the Products as 100% Natural, because of the presence of GMOs.  In addition, Plaintiff contends

27   that Defendant should state that its Products contain GMOs in its advertising not related to the

28

labeling for the Products.

114.   Plaintiff alleges that Defendant committed unlawful business acts and/or practices, as set forth in detail above. The utility of Defendant's practices related to the unlawful advertising of the Products is negligible, if any, when weighed against the harm to the general public.

115.   The harmful impact upon members of the general public who purchased and used the Products outweighs any reasons or justifications by Defendant for the unlawful advertising practices employed to sell the Products that misleadingly claims to be 100% Natural.

116.   Defendant had an improper motive (profit before accurate marketing) in its practices related to the unlawful advertising of the Products, as set forth above.

117.   The use of such unlawful business acts and practices was and is under the sole control of Defendant, and was deceptively hidden from members of the general public in Defendant's marketing and advertising of the Products.

118.   These unlawful acts and practices had a capacity, tendency, and/or were likely to deceive or confuse reasonable consumers.

119.   Defendant also committed an unlawful business practice by violating the FAL and CLRA as set forth in detail below. These violations serve as predicate violations of this prong of the UCL.

120.   As a purchaser and consumer of Defendant's Products, and as a member of the general public in California who purchased and used the Products, Plaintiff is entitled to and does bring this class action seeking all available remedies under this prong of the UCL.

121.   Defendant's unlawful advertising practices, as set forth above, were intended to promote the sale of the Products.

122.   Pursuant to California Bus. & Prof. Code § 17203, Plaintiff, on behalf of himself and members of the general public, seeks an order of this Court requiring Defendant to restore to Plaintiff and other California purchasers of the Products all monies that may have been acquired by Defendant as a result of such unlawful business acts or practices.  Plaintiff and California purchasers of the Products will be denied an effective and complete remedy in the absence of such

1    an order.

2         123.   As a result of Defendant's violations of the unlawful prong of the UCL, Plaintiff

3    and California purchasers of the Products are entitled to restitution for out-of-pocket expenses and

4    economic harm.

5         124.   Pursuant to Civil Code § 3287(a), Plaintiff and California purchasers of the

6    Products are further entitled to pre-judgment interest as a direct and proximate result of

7    Defendant's wrongful conduct. The amount on which interest is to be calculated is a sum certain

8    and capable of calculation, and Plaintiff and California purchasers of the Products are entitled to

9    interest in an amount according to proof.

10

11                            **VII. SECOND CAUSE OF ACTION:**
                  **VIOLATIONS OF CAL. BUS & PROF. CODE §§ 17200 *ET SEQ*.**
12                        **(Fraudulent Business Acts and/or Practices)**

13        125.   Plaintiff re-alleges and incorporates by reference the allegations set forth *supra* in

14   this Complaint.

15        126.   This cause of action is brought on behalf of Plaintiff and members of the general

16   public pursuant to Cal. Bus. & Prof. Code §§ 17200 *et seq*., which provides that "unfair

17   competition shall mean and include any … fraudulent business act or practice and unfair,

18   deceptive, untrue or misleading advertising and any act prohibited by Chapter I (commencing

19   with Section 17500) as Part 3 of Division 7 of the Business and Professions Code."

20        127.   Defendant has violated the fraudulent prong of the UCL by engaging in business

21   acts and practices that offend public policies and are immoral, unethical, unscrupulous and

22   substantially injurious to consumers, such as Plaintiff and members of the Class.  Specifically,

23   Defendant has advertised that the Products are 100% Natural even though the Products contain

24   GMOs and other synthetic ingredients.  Plaintiff contends that Defendant should cease advertising

25   the Products as 100% Natural, because of the presence of GMOs.  In addition, Plaintiff contends

26   that Defendant should state that its Products contain GMOs in its advertising not related to the

27   labeling for the Products.

28

128.     Plaintiff alleges that Defendant committed fraudulent business acts and/or practices, as set forth in detail above. The utility of Defendant's practices related to the fraudulent advertising of the Products is negligible, if any, when weighed against the harm to the general public.

129.     The harmful impact upon members of the general public who purchased and used the Products outweighs any reasons or justifications by Defendant for the fraudulent advertising practices employed to sell the Products that misleadingly claims to be 100% Natural.

130.     Defendant had an improper motive (profit before accurate marketing) in its practices related to the fraudulent advertising of the Products, as set forth above.

131.     The use of such fraudulent business acts and practices was and is under the sole control of Defendant, and was deceptively hidden from members of the general public in Defendant's marketing and advertising of the Products.

132.     These fraudulent acts and practices had a capacity, tendency, and/or were likely to deceive or confuse reasonable consumers.

133.     Defendant also committed a fraudulent business practice by violating the FAL and CLRA as set forth in detail below. These violations serve as predicate violations of this prong of the UCL.

134.     As a purchaser and consumer of Defendant's Products, and as a member of the general public in California who purchased and used the Products, Plaintiff is entitled to and does bring this class action seeking all available remedies under this prong of the UCL.

135.     Defendant's fraudulent advertising practices, as set forth above, were intended to promote the sale of the Products.

136.     Pursuant to California Bus. & Prof. Code § 17203, Plaintiff, on behalf of himself and members of the general public, seeks an order of this Court requiring Defendant to restore to Plaintiff and other California purchasers of the Products all monies that may have been acquired by Defendant as a result of such fraudulent business acts or practices.  Plaintiff and California purchasers of the Products will be denied an effective and complete remedy in the absence of such

1    an order.

2        137.    As a result of Defendant's violations of the fraudulent prong of the UCL, Plaintiff

3    and California purchasers of the Products are entitled to restitution for out-of-pocket expenses and

4    economic harm.

5        138.    Pursuant to Civil Code § 3287(a), Plaintiff and California purchasers of the

6    Products are further entitled to pre-judgment interest as a direct and proximate result of

7    Defendant's wrongful conduct. The amount on which interest is to be calculated is a sum certain

8    and capable of calculation, and Plaintiff and California purchasers of the Products are entitled to

9    interest in an amount according to proof.

10

11                          **VIII. THIRD CAUSE OF ACTION:**
                  **VIOLATIONS OF CAL. BUS & PROF. CODE §§ 17200 *ET SEQ*.**
12                        **(Unfair Business Acts and/or Practices)**

13       139.    Plaintiff re-alleges and incorporates by reference the allegations set forth *supra* in

14   this Complaint.

15       140.    This cause of action is brought on behalf of Plaintiff and members of the general

16   public pursuant to Cal. Bus. & Prof. Code §§ 17200 *et seq*., which provides that "unfair

17   competition shall mean and include any … unfair … business act or practice and unfair, deceptive,

18   untrue or misleading advertising and any act prohibited by Chapter I (commencing with Section

19   17500) as Part 3 of Division 7 of the Business and Professions Code."

20       141.    Defendant has violated the unfairness prong of the UCL by engaging in business

21   acts and practices that offend public policies and are immoral, unethical, unscrupulous and

22   substantially injurious to consumers, such as Plaintiff and members of the Class.  Specifically,

23   Defendant has advertised that the Products are 100% Natural even though the Products contain

24   GMOs.  Plaintiff contends that Defendant should cease advertising the Products as 100% Natural,

25   because of the presence of GMOs and other synthetic ingredients.  In addition, Plaintiff contends

26   that Defendant should state that its Products contain GMOs in its advertising not related to the

27   labeling for the Products.

28

142.    Plaintiff alleges that Defendant committed unfair business acts and/or practices, as set forth in detail above. The utility of Defendant's practices related to the unfair advertising of the Products is negligble, if any, when weighed against the harm to the general public.

143.    The harmful impact upon members of the general public who purchased and used the Products outweighs any reasons or justifications by Defendant for the unfair advertising practices employed to sell the Products that misleadingly claims to be 100% Natural.

144.    Defendant had an improper motive (profit before accurate marketing) in its practices related to the unfair advertising of the Products, as set forth above.

145.    The use of such unfair business acts and practices was and is under the sole control of Defendant, and was deceptively hidden from members of the general public in Defendant's marketing and advertising of the Products.

146.    These unfair acts and practices had a capacity, tendency, and/or were likely to deceive or confuse reasonable consumers.

147.    Defendant also committed an unfair business practice by violating the FAL and CLRA as set forth in detail below. These violations serve as predicate violations of this prong of the UCL.

148.    As a purchaser and consumer of Defendant's Products, and as a member of the general public in California who purchased and used the Products, Plaintiff is entitled to and does bring this class action seeking all available remedies under this prong of the UCL.

149.    Defendant's unfair advertising practices, as set forth above, were intended to promote the sale of the Products.

150.    Pursuant to California Bus. & Prof. Code § 17203, Plaintiff, on behalf of himself and members of the general public, seeks an order of this Court requiring Defendant to restore to Plaintiff and other California purchasers of the Products all monies that may have been acquired by Defendant as a result of such unfair business acts or practices.   Plaintiff and California purchasers of the Products will be denied an effective and complete remedy in the absence of such an order.

151.    As a result of Defendant's violations of the unfairness prong of the UCL, Plaintiff and California purchasers of the Products are entitled to restitution for out-of-pocket expenses and economic harm.

152.    Pursuant to Civil Code § 3287(a), Plaintiff and California purchasers of the Products are further entitled to pre-judgment interest as a direct and proximate result of Defendant's wrongful conduct. The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and California purchasers of the Products are entitled to interest in an amount according to proof.

## IX. FOURTH CAUSE OF ACTION:
## VIOLATIONS OF CAL. BUS. & PROF. CODE §§ 17500 *ET SEQ.*

153.    Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

154.    In violation of California Bus. & Prof. Code §§ 17500, *et seq.* Defendant disseminated, or caused to be disseminated, the untrue and/or misleading advertising representations that claim that the Products are 100% Natural.   Defendant's advertising representations are untrue or misleading because the presence of GMOs and other synthetic ingredients in the Products renders them to not be 100% Natural.   Plaintiff contends that Defendant should cease advertising the Products as 100% Natural, because of the presence of GMOs.  In addition, Plaintiff contends that Defendant should state that its Products contain GMOs in its advertising not related to the labeling for the Products.

155.    Defendant's advertising representations for the Products are by their very nature untrue and/or misleading within the meaning of California Bus. & Prof. Code §§ 17500 *et seq.* The representations were likely to deceive reasonable consumers.

156.    In making and disseminating the deceptive representations alleged herein, Defendant knew or should have known that the representations were misleading, and acted in violation of California's Bus. & Prof. Code §§ 17500 *et seq.*

157.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiff and California purchasers of the Products have suffered substantial monetary and non-monetary damage.

158.    Pursuant to Bus. & Prof. Code § 17535, Plaintiff, on behalf of himself and other California purchasers of the Products, seeks an order of this Court requiring Defendant to restore to California purchasers of the Products all monies that may have been acquired by Defendant as a result of such unlawful, fraudulent, unfair, misleading, and/or deceptive acts or practices.

159.    As a result of Defendant's violations of the FAL, Plaintiff and California purchasers of the Products are entitled to restitution for out-of-pocket expenses and economic harm.

160.    Pursuant to Civil Code § 3287(a), Plaintiff and California purchasers of the Products are further entitled to pre-judgment interest as a direct and proximate result of Defendant's wrongful conduct.

161.    The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and California purchasers of the Products are entitled to interest in an amount according to proof.

**X. FIFTH CAUSE OF ACTION:**
**FOR VIOLATIONS OF CAL. CIV. CODE §§ 1750 *ET SEQ.***

162.    Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

163.    This cause of action is brought pursuant to Cal. Civ. Code §§ 1750 *et seq.*

164.    Plaintiff and each California purchaser of the Products are "consumers" within the meaning of Civil Code §1761(d).

165.    The purchases of the Products by Plaintiff and California purchasers of the Products were and are "transactions" within the meaning of Civil Code §1761(e).

166.    Defendant has represented that the Products are 100% Natural.  Plaintiff contends

that Defendant advertised the Products as 100% Natural, when they are not, because of the presence of GMOs and other synthetic ingredients in the Products' ingredients, which renders the Products not 100% Natural, and which violated the CLRA in at least the following respects:

a.  In violation of Civil Code §1770(a)(5), GENERAL MILLS represented that the Products have characteristics, ingredients, uses, and benefits which they do not have;

b.  In violation of Civil Code §1770(a)(7), GENERAL MILLS represented that the Products are of a particular standard, quality, or grade, which they are not;

c.  In violation of Civil Code §1770(a)(9), GENERAL MILLS advertised the Products with an intent not to sell the Products as advertised;

d.  In violation of Civil Code §1770(a)(14), GENERAL MILLS represented that the purchase of the Products confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; and

e.  In violation of Civil Code §1770(a)(16), GENERAL MILLS represented that the subject of the sale of the Products has been supplied in accordance with a previous representation when it has not.

167.  Plaintiff seeks and is entitled to injunctive, equitable relief in the form of an order requiring Defendant to make full restitution to California purchasers of the Products of all monies wrongfully obtained as a result of the conduct described above.

168.  Plaintiff, by and through counsel, has notified Defendant in writing of the particular violations of § 1770 of the CLRA, and demanded that it take certain corrective actions within the period prescribed by the CLRA for such demands.

169.  Defendant has failed to adequately respond to the demands for corrective action within the time prescribed by the CLRA.

170.  Therefore, Plaintiff requests statutory and actual damages, as well as punitive damages, interest and attorneys' fees as authorized by § 1780(a) of the CLRA, along with this claim for injunctive relief.

171.    In addition to an award of damages, Plaintiff seeks and is entitled to, pursuant to § 1780(a)(2) of the CLRA, an order for the equitable relief described above, as well as costs, attorney's fees and any other relief which the Court deems proper.

## XI. **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, GABRIEL ROJAS, individually, and on behalf of all others similarly situated, prays for relief pursuant to each cause of action set forth in this Second Amended Complaint as follows:

1.    For an order certifying that the action may be maintained as a class action, certifying Plaintiff as representative of the Class, and designating his attorneys Class counsel;

2.    For an award of equitable relief for all causes of action as follows:

(a)    Enjoining Defendant from making any claims for the Products found to violate the UCL, FAL, or CLRA as set forth above; and

(b)    Requiring Defendant to make full restitution of all monies wrongfully obtained as a result of the conduct described in this Complaint.

3.    For actual damages in an amount to be determined at trial for all causes of action;

4.    For actual, statutory, and punitive damages in an amount to be determined at trial for the Fifth Cause of Action for violations of the CLRA, because the demanded corrections failed to occur within the statutory thirty (30) day period.

5.    For an award of attorney's fees pursuant to, *inter alia*, § 1780(d) of the CLRA and Code of Civil Procedure § 1021.5.

6.    For an award of costs and any other award the Court might deem just, appropriate, or proper; and

7.    For pre- and post-judgment interest on any amounts awarded**.**

## XII. **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all issues so triable.

**Respectfully Submitted,**

Dated: **November 8, 2013**

By: /s/   Benjamin M. Lopatin
Benjamin M. Lopatin, Esq.
Cal. Bar No.: 281730
*lopatin@hwrlawoffice.com*
THE LAW OFFICES OF
HOWARD W. RUBINSTEIN, P.A.
One Embarcadero Center, Suite 500
San Francisco, CA 94111
(800) 436-6437
(415) 692-6607 (fax)

L. De-Wayne Layfield, Esq.
Texas Bar No.:  12065710
*dewayne@layfieldlaw.com*
LAW OFFICE OF
L. DEWAYNE LAYFIELD
PO Box 3829
Beaumont, TX 77704-3829
(409) 832-1891
(866) 280-3004 (fax)
(To apply as counsel *Pro Hac Vice*)

Angela Arango-Chaffin, Esq.
Fla. Bar No: 87919
*angela@chaffinlawfirm.com*
1455 Ocean Drive, Suite 811
Miami Beach, FL 33139
(713) 818-2515 (o);
(713) 952-5972 (f)
(To apply as counsel *Pro Hac Vice*)

Michael Robert Reese, Esq.
California Bar No.:  206773
mreese@reeserichman.com
REESE RICHMAN LLP
875 Avenue of the Americas, 18th Floor
New York, NY 10001
(212) 643-0500
(212) 253-4272 (fax)

Attorneys for Plaintiff Gabriel Rojas
and the Proposed Class

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on this **8<u>th</u> day of November, 2013**, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record by transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/*  Benjamin M. Lopatin
Benjamin M. Lopatin, Esq.
